# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 14, 2011 Decided August 7, 2012

No. 10-5405

JOHN R. MILLER, JR.,
APPELLANT

v.

HILLARY RODHAM CLINTON, SECRETARY OF STATE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00512)

*Marshall N. Perkins* argued the cause and filed the briefs for appellant.

*Daniel J. Lenerz*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Tony West*, Assistant Attorney General, *Ronald C. Machen*, *Jr.*, United States Attorney, and *Marleigh D. Dover*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS, GARLAND, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

GARLAND, *Circuit Judge*: There is no dispute that the State Department terminated the employment of John R. Miller, Jr., a United States citizen working abroad, solely because he turned sixty-five years old. Indeed, it is the position of the Department that it is free to terminate employees like Miller on account of their age. Moreover, the necessary consequence of the Department's position is that it is also free from any statutory bar against terminating an employee like Miller solely on account of his disability or race or religion or sex.

After being dismissed on his sixty-fifth birthday, Miller brought suit alleging that his forced retirement violated the federal employment provisions of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 633a. Accepting the State Department's position, the district court dismissed Miller's complaint on the ground that the statute under which Miller was hired, section 2(c) of the Basic Authorities Act, 22 U.S.C. § 2669(c), permits the Department to exempt Miller from the protections of the ADEA. We reverse, finding nothing in the Basic Authorities Act that abrogates the ADEA's broad proscription against personnel actions that discriminate on the basis of age.

I

Miller is a U.S. citizen who was employed by the Department of State as a safety inspector at the U.S. embassy in Paris, France. He was hired in October 2003 as "locally employed staff" pursuant to a personal services agreement. Miller's contract was negotiated and signed under the authority of section 2(c) of the Basic Authorities Act, which authorizes the Secretary of State to "employ individuals or organizations, by contract, for services abroad." 22 U.S.C. § 2669(c); *see* U.S.

Dep't of State Personal Servs. Agreement (J.A. 23) (identifying 22 U.S.C. § 2669(c) as the exclusive "[s]tatutory authority for this agreement"). The proper construction of § 2669(c) is the central issue on this appeal.

Among other standard contractual provisions, Miller's employment contract incorporates by reference "[a]ll provisions of the local compensation plan" for Foreign Service National employees in France. J.A. 23. One provision of the Local Compensation Plan (LCP) is a mandatory retirement clause. That clause follows the (apparently) prevailing French practice of mandating retirement at age sixty-five, and expressly states that "[a]ge 65 is the mandatory age limit for all employees under the LCP." Foreign Serv. Nat'l Comp. Plan (J.A. 26).

In accordance with the mandatory retirement clause, Miller was advised by letter dated March 22, 2007 that he would be separated from his position due to age, effective July 23, 2007, his sixty-fifth birthday. There is no dispute among the parties that the sole reason for Miller's termination was his age. The Department has not identified any concerns regarding Miller's job performance or his ability to perform his duties. According to Miller's supervisor, "[t]here was no other reason, to my knowledge, for Mr. Miller's separation[;] it was strictly the mandatory age issue." Kenan H. Hunter, EEO Investigative Aff. (J.A. 90).

After receiving the notice of termination, Miller requested a one-year extension of employment through the State Department's Human Resources system. The request was denied. Miller then unsuccessfully pursued administrative remedies at the Equal Employment Opportunity Commission (EEOC). Having properly exhausted his administrative remedies, Miller filed suit in the U.S. District Court for the

District of Columbia, alleging that his termination for turning sixty-five violated the ADEA, 29 U.S.C. § 633a.

The State Department moved to dismiss Miller's complaint for failure to state a claim, and Miller filed a cross-motion for summary judgment of liability. On November 4, 2010, the district court granted the State Department's motion and dismissed the case with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), holding that the Secretary of State may exempt employees hired under the authority of § 2669(c) from the statutory protections of the ADEA. *Miller v. Clinton*, 750 F. Supp. 2d 11, 15-20 (D.D.C. 2010). The district court denied Miller's cross-motion for summary judgment and denied all remaining motions as moot. *Id.* at 20. This appeal followed.

II

This court reviews de novo the district court's dismissal of a complaint for failure to state a claim. *Payne v. Salazar*, 619 F.3d 56, 59 (D.C. Cir. 2010). In this case, our review of the district court's decision requires us to examine the relationship between the ADEA, one of the signature pieces of legislation prohibiting discrimination in the workplace, and section 2(c) of the Basic Authorities Act, an omnibus statute concerned with (inter alia) the organization and authorities of the Department of State.

In 1974, Congress amended the ADEA to address "[n]ondiscrimination on account of age in Federal Government employment." 29 U.S.C. § 633a. Section 633a broadly declares that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age." *Id.* § 633a(a). The section includes an exception for "personnel actions with regard to *aliens* employed outside the limits of the United

States," *id.* (emphasis added), but contains no parallel exception for U.S. citizens so employed. Accordingly, it is undisputed that, as a general matter, the protections of § 633a extend extraterritorially to cover United States citizens employed by federal agencies abroad. *See id.* (stating that the statute is applicable to "executive agencies as defined in section 105 of Title 5"); *see also* 5 U.S.C. § 105 ("For purposes of this title, 'Executive Agency' means an Executive Department [or] a Government corporation.").

The Supreme Court has recognized that the ADEA's sweeping mandate "broadly prohibits arbitrary discrimination in the workplace based on age." *Lorillard v. Pons*, 434 U.S. 575, 577 (1978). The Act's protections for employees of the federal government are, if anything, even more expansive than those for workers employed in the private sector, *see Ford v. Mabus*, 629 F.3d 198, 205-06 (D.C. Cir. 2010); *Forman v. Small*, 271 F.3d 285, 296-97 (D.C. Cir. 2001), and § 633a's flat prohibition of "any discrimination based on age" means, among other things, that federal employees cannot be subjected to mandatory retirement at any age, *Johnson v. Mayor of Baltimore*, 472 U.S. 353, 356 n.1 (1985). There is, in short, "no permissible [age] cap" for federal employment. *Id.*

Because Miller is a U.S. citizen employed by a federal agency who was forced to retire solely because he turned sixty-five, § 633a would appear to begin and end the matter. That is, of course, unless another act of Congress subsequently exempted employees like Miller from the ADEA's general coverage. The State Department contends that section 2(c) of the Basic Authorities Act, 22 U.S.C. § 2669(c) -- the relevant clauses of which were added in 1985 and 1994 -- is such an act.[1]

---

[1]The ADEA was first passed in 1967, and was amended to apply to federal employees in 1974. *See* Fair Labor Standards Amendments

In Part III, we will examine those clauses in detail. For now, we simply set out the text of § 2669(c) in the margin, and note that if the section does in fact contain an exemption from the ADEA, it is one that must be inferred from text of unusual opacity.[2] In the balance of this Part, we address the considerations that will guide our examination of that text.

---

of 1974, Pub. L. No. 93-259, 88 Stat. 55 (1974). Congress did not add the two clauses of § 2669(c) that are at issue in this case until 1985 and 1994. *See* Foreign Relations Authorization Act, Fiscal Years 1994 & 1995, Pub. L. No. 103-236, 108 Stat. 382 (1994); Foreign Relations Authorization Act, Fiscal Years 1986 & 1987, Pub. L. No. 99-93, 99 Stat. 405 (1985).

[2] The Secretary of State may use funds appropriated or otherwise available to the Secretary to . . .

(c) employ individuals or organizations, by contract, for services abroad, and individuals employed by contract to perform such services shall not by virtue of such employment be considered to be employees of the United States Government for purposes of any law administered by the Office of Personnel Management (except that the Secretary may determine the applicability to such individuals of subsection (f) of this section and of any other law administered by the Secretary concerning the employment of such individuals abroad); and such contracts are authorized to be negotiated, the terms of the contracts to be prescribed, and the work to be performed, where necessary, without regard to such statutory provisions as relate to the negotiation, making, and performance of contracts and performance of work in the United States.

22 U.S.C. § 2669(c).

A

1. We begin by noting that the Defendant's "subsequent exceptions" argument faces something of an uphill climb. The ADEA "grants an injured employee a right of action" in order to "'vindicat[e] the important congressional policy against discriminatory employment practices.'" *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 358 (1995) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 45 (1974)); *see Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 27 (1991) (noting that "the ADEA is designed not only to address individual grievances, but also to further important social policies"). Given the importance Congress ascribed to the ADEA, it would be surprising if it had enacted subsequent exemptions using ambiguous language.

Moreover, the consequences of the State Department's argument cannot be limited to the ADEA alone. As we discuss below, *see infra* Part III.C.1, if we were to accept the Department's contention that § 2669(c) creates an exemption from the ADEA, we would have to reach the same conclusion regarding both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*[3] We see no way to distinguish the latter two statutes from the ADEA. *See*

---

[3]The Rehabilitation Act protects federal employees from discrimination on account of disability. 29 U.S.C. § 794(a). The Act provides that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination . . . shall be the standards applied under [provisions of] the Americans with Disabilities Act." *Id.* § 794(d). For convenience, this opinion will refer to "the ADA" as a shorthand for the laws barring discrimination on the basis of disability by both private employers and the federal government.

*McKennon*, 513 U.S. at 358 (explaining that the "ADEA and Title VII share common substantive features and also a common purpose: the elimination of discrimination in the workplace" (internal citation and quotation marks omitted)); *id.* at 357 (noting that the "ADEA is but part of a wider statutory scheme to protect employees in the workplace nationwide" (citing, inter alia, Title VII and the ADA)); *see also Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756 (1979). The Department neither offers a distinction nor disputes this conclusion.

Although we would hesitate to read an ambiguous statutory provision as exempting a class of U.S. citizens from the coverage of the ADEA, we must hesitate even longer before inferring that Congress meant to exempt them from the protections of the entire edifice of its antidiscrimination canon. Congress has made clear that it regards those protections as extremely important.[4] We simply do not believe it would have authorized the State Department to ignore statutory proscriptions against discrimination on the basis of age, disability, race, religion, or sex through the use of ambiguous language. And while the Department and our dissenting colleague assure us that

---

[4]*See* 42 U.S.C. § 12101(a)(2)-(3), (8) (ADA) ("The Congress finds that . . . discrimination against individuals with disabilities continue[s] to be a serious and pervasive social problem . . . [that] persists in such critical areas as employment," and "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous."); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (noting that a purpose of Title VII was to "eliminate . . . the last vestiges of an unfortunate and ignominious page in this country's history" (internal quotation marks omitted)); *Alexander*, 415 U.S. at 45 (noting that the private Title VII litigant "not only redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices").

the Constitution would continue to protect government employees from the kinds of discrimination covered by Title VII, *see* Dep't of State (DOS) Br. 11 n.2; Dissent at 14 & n.7,[5] by expressly extending the statutory protections of Title VII to government employees Congress made clear that it did not regard constitutional protections as sufficient. *See* Pub. L. No. 92-261, § 11, 86 Stat. 103, 111 (1972); H.R. Rep. No. 92-238, at 2157, 2160 (1972); *see also Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 825 (1976). Moreover, no such assurance of constitutional protection can be made with respect to age discrimination barred by the ADEA or disability discrimination barred by the ADA.[6]

2. Our confidence that Congress would not have used ambiguous language had it intended to override the ADEA is confirmed by considering the language that Congress *did* use when it intended to carve out exceptions from that statute. As these examples show, when Congress had such an intention, it made that intention clear.

First, the ADEA itself contains express exemptions from its coverage. *See, e.g.*, 29 U.S.C. §§ 623(f)(1)-(3), 633a(a). As

---

[5]The Department is unwilling to assure us, however, that a citizen would have a remedy in the event of a constitutional violation. Oral Arg. Recording at 16:10-16:55 (declining to say whether an overseas employee would have a remedy for racial discrimination under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)).

[6]*See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000) (holding that, because "age is not a suspect classification under the Equal Protection Clause," age classifications are only subject to rational basis review); *see also Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (same regarding disability discrimination).

noted above, these include an express exemption for personnel actions involving aliens employed abroad by federal agencies -- an exemption that plainly does not apply to Miller, a U.S. citizen. *See id.* § 633a(a). The ADEA also specifies the limited circumstances under which it does not bind private employers operating overseas -- circumstances that would be inapplicable to Miller's case even if he were employed in the private sector. *See* 29 U.S.C. § 623(f) (providing that "[i]t shall not be unlawful for an employer . . . (1) to take any action otherwise prohibited . . . where such practices involve an employee in a workplace in a foreign country, and compliance with such subsections would cause such employer . . . to violate the laws of the country in which such workplace is located").

Second, in several statutes Congress has clearly and affirmatively authorized the kind of mandatory retirement clause at issue here -- but for specified classes of government employees that, again, do not include Miller. The statute that governs the Foreign Service Retirement and Disability System is one example. It states that "any participant shall be retired from the Service at the end of the month in which the participant has reached age 65." 22 U.S.C. § 4052(a)(1). In *Strawberry v. Albright*, 111 F.3d 943 (D.C. Cir. 1997), a State Department employee who participated in a pension system governed by § 4052(a)(1) brought suit contending that the system's mandatory retirement provision violated the ADEA. Not surprisingly, this court had little difficulty concluding that "the ADEA's general prohibition of age discrimination does not prohibit enforcement of the mandatory retirement provision[]" for participants in the system, because § 4052(a)(1) specifically mandates retirement at age sixty-five and was passed after the ADEA was made applicable to federal employees. *Id.* at 947. Section 4052(a)(1) does not apply to Miller, however, because he was never a member of the Foreign Service or a participant in its retirement system.

Another example is the statute applicable to the employment of law enforcement officers by federal agencies. That statute both establishes a mandatory retirement age, 5 U.S.C. § 8335(b), and authorizes agencies to fix a maximum age for initial appointments, *id.* § 3307(d). In *Stewart v. Smith*, 673 F.2d 485 (D.C. Cir. 1982), plaintiffs challenged the Bureau of Prisons' policy of refusing to hire applicants over age thirty-four as violating the federal employment provisions of the ADEA, which were enacted approximately three months before passage of the federal law enforcement employment statute. Once again, we had little difficulty rejecting the challenge. It "is evident," we said, "that Congress meant to do what the statute's terms suggest, namely, to provide for maximum age requirements for law enforcement officers." *Id.* at 492.

Indeed, as the dissenting opinion notes, Congress has seen fit to allow exceptions not only from the ADEA but from other antidiscrimination statutes as well. Dissent at 13-14; *see id.* at 3. But what these provisions demonstrate is that Congress knows how to limit the ADEA and other statutes when it wishes to do so. When that is Congress' purpose, it makes its intention clear by using language that makes express exceptions from those statutes or expressly permits the making of distinctions those statutes would otherwise prohibit. That is true of all of the statutory exceptions catalogued by the dissent. *See id.* at 3, 13-14. Once again, this confirms the wisdom of being cautious about finding that Congress intended a subsequent statute to override the application of the antidiscrimination laws to a particular class of employees when the only evidence of such intent is ambiguous language.

B

The State Department's principal position is that "[t]he plain language of [§ 2669(c)] expressly permits the Secretary to

enter into employment contracts with individuals like Miller without regard to statutory provisions such as the ADEA." DOS Br. 11. If the plain language were as express as the State Department contends, the Department would of course prevail. But the Department goes further, insisting that, even if the statutory language is ambiguous, "the Secretary's longstanding interpretation . . . is entitled to deference" under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). DOS Br. 18. Under *Chevron*'s familiar second step, "if the statute is silent or ambiguous with respect to the specific" point at issue, a court must uphold the agency's interpretation as long as it is reasonable. *Id.* at 843.[7]

The State Department does not contend that it is entitled to *Chevron* deference for an interpretation of the ADEA, since that statute "applies to all government agencies, and thus no one executive branch entity is entrusted with its primary interpretation." *Reporters Comm. for Freedom of the Press v. U.S. Dep't of Justice*, 816 F.2d 730, 734 (D.C. Cir. 1987) (regarding the Freedom of Information Act), *rev'd on other grounds*, 489 U.S. 749 (1989). The Department does, however, claim deference for its interpretation of the Basic Authorities Act, a statute that it solely administers. Two caveats to *Chevron*'s applicability, however, render its deference rule unwarranted here.

First, not every kind of agency interpretation, even of a statute the agency administers, warrants *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 227-31 (2001). We do not, for example, defer to post hoc interpretations contained

---

[7]Nonetheless, the Department made clear at oral argument that "we don't fundamentally think this is a case about deference. We think it's about the plain statutory language." Oral Arg. Recording at 22:45-22:50.

in agency briefs.[8] Instead, in accordance with the Supreme Court's decision in *Mead*, we accord *Chevron* deference only when Congress has "delegated authority to the agency generally to make rules carrying the force of law, and . . . the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id*. at 226-27; *see Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 659-60 (D.C. Cir. 2003). The Department does not cite any such rules or regulations here. Whether or not more informal documents like the Department's Foreign Affairs Handbook and Foreign Affairs Manual would qualify for *Chevron* treatment,[9] there is no mention of mandatory retirement (or an exemption from the ADEA) in the provisions of those documents that the Department cites.[10]

---

[8]*See Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)); *Town of Stratford v. FAA*, 292 F.3d 251, 253 (D.C. Cir. 2002); *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1135-36 (D.C. Cir. 2001); *Fogg v. Ashcroft*, 254 F.3d 103, 109 (D.C. Cir. 2001); *St. Agnes Hosp. v. Sullivan*, 905 F.2d 1563, 1568 (D.C. Cir. 1990); *see also Martin v. OSHRC*, 499 U.S. 144, 156 (1991) ("Our decisions indicate that agency 'litigating positions' are not entitled to deference when they are merely appellate counsel's 'post hoc rationalizations' for agency action, advanced for the first time in the reviewing court.").

[9]*See Pub. Citizen*, 332 F.3d at 660 (noting that courts have found some agency manuals unworthy of *Chevron* deference); *Scales v. INS*, 232 F.3d 1159, 1166 (9th Cir. 2000) (declining to accord *Chevron* deference to the Foreign Affairs Manual); *cf. Mead*, 533 U.S. at 234 (suggesting that "agency manuals" are "beyond the *Chevron* pale").

[10]One of the cited provisions deals with compensation practices, not with mandatory retirement. *See* 3 Foreign Affairs Handbook 2 § H-214(C) ("The terms of personal services contracts (PSC's) will conform to the conditions of employment for direct-hire [Foreign

At oral argument, the State Department acknowledged that the Secretary has never promulgated a written interpretation of § 2669(c) that asserts the section authorizes her to find the ADEA inapplicable to a contract like Miller's. Oral Arg. Recording at 21:10-21:20. Indeed, there is no evidence that the current Secretary or any of her predecessors ever knew of the interpretation being advanced in their names. Instead, the Department asks us to rely upon the contract itself, which, the Department says, reflects the agency's consistent practice of at least twenty years. *Id.* at 21:20-21:35. But the (apparently standard) personal services agreement (PSA) that Miller signed says nothing at all about mandatory retirement. *See* J.A. 23. It merely states that "[a]ll provisions of the local compensation plan . . . shall apply to payments to the employee." *Id.* The local compensation plan (LCP) for France does state: "Age 65

---

Service National] employees insofar as possible. *Compensation, that is, pay and benefits* provided to PSC personnel, will be . . . paid in accordance with the compensation provisions . . . of the local compensation plan." (emphasis added)). Another provision states that, "when required in local benefit plans," local compensation plans may include distinctions based on age "for retirement *eligibility* in prevailing practice." *Id.* § H-214(B)(4) (emphasis added). But a provision that *forces* retirement at age sixty-five is not on its face a provision regarding retirement *eligibility*. The State Department also points to 3 Foreign Affairs Manual § 7113.3, which declares that "[i]t is the policy of the U.S. Government that all agencies . . . employ locally employed (LE) staff consistent with host country law insofar as U.S. law is not violated and adoption of local law is consistent with the U.S. public interest." But the Secretary has not identified any provision of French law that affirmatively requires retirement at age sixty-five, while forced retirement of federal employees at any age does violate the ADEA. Finally, we note that, even if these provisions could be characterized as authorizing a mandatory retirement age, they do not *explain* why that is a proper interpretation of § 2669(c), and hence fail the second *Chevron* caveat discussed below.

is the mandatory age limit for all employees under the LCP." J.A. 26. But the authorship and formality of both the LCP and the PSA are so uncertain that we are doubtful either would qualify for *Chevron* deference. *See Pub. Citizen*, 332 F.3d at 660-61 ("No court has read *Mead* as extending *Chevron* deference to a contract entered into between an agency and a private party, and we are loathe to permit agencies to bootstrap documents that otherwise would not warrant *Chevron* deference into a more exalted status merely by mentioning them in such a contract.").

More important, even if the LCP or the PSA were the kind of documents that warrant *Chevron* deference, they fail a second *Chevron* caveat: "[A]lthough we will defer to a reasonable [interpretation] by [an agency], we cannot defer to one that is unexplained." *TNA Merchant Projects, Inc. v. FERC*, 616 F.3d 588, 593 (D.C. Cir. 2010); *see Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009). When an agency fails to provide an explanation for its interpretation of a statutory provision, we will not grant it deference because we "'cannot evaluate whether the [agency's] interpretation of the statute is reasonable within the meaning of *Chevron*.'" *Se. Ala. Med. Ctr.*, 572 F.3d at 920 (quoting *Kidney Ctr. of Hollywood v. Shalala*, 133 F.3d 78, 88 (D.C. Cir. 1998)). As just noted, the PSA does not mention mandatory retirement at all. Although the LCP does declare that sixty-five is the mandatory retirement age for those employed under the LCP, "there is no place in the [document] where the agency explains *why* it believes" a mandatory retirement age is permissible under § 2669(c). *Pub. Citizen*, 332 F.3d at 661. Indeed, the LCP does not cite § 2669(c) -- or any statute -- for that proposition. *See* J.A. 26. "Because the [document] thus contains no reasoning that we can evaluate for its reasonableness, the high level of deference contemplated in *Chevron*'s second step is simply inapplicable." *Pub. Citizen*, 332 F.3d at 661.

With *Chevron* inapplicable, we proceed to determine the meaning of the Basic Authorities Act the old-fashioned way: "we must decide for ourselves the best reading." *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1136 (D.C. Cir. 2001).[11]

III

The State Department rests its claim to an exemption from the ADEA on the text of the statute under which Miller was hired, 22 U.S.C. § 2669(c). With the addition of bolded and bracketed arabic numerals, which we have inserted to mark three clauses for the clarity of the ensuing discussion, that section provides:

> The Secretary of State may use funds appropriated or otherwise available to the Secretary to . . .
>
> (c) employ individuals or organizations, by contract, for services abroad, **[1]** and individuals employed by contract to perform such services shall not by virtue of such employment be considered to be employees of the United States Government for purposes of any law administered by the Office of Personnel Management **[2]** (except that the Secretary may determine the applicability to such individuals of subsection (f) of this section and of any other law administered by the Secretary concerning the employment of such individuals abroad); **[3]** and such contracts are authorized to be negotiated, the terms of the contracts to be prescribed, and the work to be performed, where

---

[11]We do, of course, give the Department's views "the weight derived from their 'power to persuade.'" *Landmark*, 267 F.3d at 1136 (quoting, inter alia, *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

> necessary, without regard to such statutory provisions as relate to the negotiation, making, and performance of contracts and performance of work in the United States.

22 U.S.C. § 2669(c). We examine each of the marked clauses seriatim, in order to determine whether any of them grants the State Department the exemption it claims.

## A

The portion of § 2669(c) that we have marked as clause 1 states:

> and individuals employed by contract to perform such services [i.e., services abroad] shall not by virtue of such employment be considered to be employees of the United States Government for purposes of any law administered by the Office of Personnel Management

22 U.S.C. § 2669(c). Our examination of this clause can be brief: as the government concedes, *see* DOS Br. 13 & n.3, the clause cannot support the Department's claim for an ADEA exemption because the ADEA is not a "law administered by the Office of Personnel Management" (OPM). Rather, it is (if anything) a law administered by the Equal Employment Opportunity Commission. *See* 29 U.S.C. §§ 628, 633a(b). Accordingly, this clause does not exclude § 2669(c) employees from the category of "employees of the United States Government" for purposes of the ADEA. Indeed, the *expressio unius* maxim suggests that the clause (considered in isolation) confirms that § 2669(c) employees *are* employees of the federal

government for purposes of any law *not* administered by OPM -- a class of laws that includes the ADEA.[12]

B

The second clause of § 2669(c) is contained in a parenthetical that reads:

> (except that the Secretary may determine the applicability to such individuals of subsection (f) of this section and of any other law administered by the Secretary concerning the employment of such individuals abroad)

22 U.S.C. § 2669(c). In the State Department's view, the language of this parenthetical gives it the authority to subject Miller and other § 2669(c) employees to forced retirement at age sixty-five. DOS Br. 20-24.

On its face, the clause contains no such grant of authority. The reference to "subsection (f) of this section" is irrelevant to this case: that subsection authorizes the Secretary to use appropriated funds to "pay tort claims . . . when such claims arise in foreign countries in connection with Department of State operations abroad." 22 U.S.C. § 2669(f). Nor does the balance of the clause -- "and of any other law administered by the Secretary concerning the employment of such individuals abroad," *id.* § 2669(c) -- empower the Secretary to determine the applicability of the ADEA to Miller. As we have noted above,

---

[12]*See In re Sealed Case No. 97-3112*, 181 F.3d 128, 132 (D.C. Cir. 1999) (applying the "legal maxim *expressio unius est exclusio alterius* ('the mention of one thing implies the exclusion of another')," while noting that it "is not always correct").

*see supra* Part II.B, the ADEA is not a "law administered by the Secretary," 22 U.S.C. § 2669(c).

Lacking any straightforward textual hook in the second clause of § 2669(c), the State Department makes a more round-about argument. In its view, the language authorizing the Secretary to "determine the applicability to such individuals of . . . any other law administered by the Secretary concerning the employment of such individuals abroad," *id.*, allows the Department to cross-apply another statute, section 408 of the Foreign Service Act, 22 U.S.C. § 3968, to employees like Miller. That statute, the Department maintains, authorizes it to use local compensation plans that include mandatory retirement provisions based on age.[13] We reject this argument for two independent reasons.

---

[13]Section 408 provides, in relevant part:

> The Secretary shall establish compensation (including position classification) plans for foreign national employees of the Service and United States citizens employed under section 3951(c)(1) of this title. To the extent consistent with the public interest, each compensation plan shall be based upon prevailing wage rates and compensation practices (including participation in local social security plans) for corresponding types of positions in the locality of employment . . . . For United States citizens under a compensation plan, the Secretary shall define those allowances and benefits provided under United States law which shall be included as part of the total compensation package, notwithstanding any other provision of law, except that this section shall not be used to override United States minimum wage requirements, or any provision of the Social Security Act [42 U.S.C.A. §§ 301 *et seq.*] or Title 26.

22 U.S.C. § 3968(a)(1).

First, the State Department's argument elides significant statutory language in § 2669(c). The second clause does not unqualifiedly authorize the Secretary to determine the applicability of "any other law administered by the Secretary," but rather of "any other law administered by the Secretary *concerning the employment of such individuals abroad*." 22 U.S.C. § 2669(c) (emphasis added). Read in context, the "such individuals" referenced in the italicized phrase must be the same "individuals" mentioned at the beginning of § 2669(c): namely, "individuals employed by contract to perform" services abroad under the authority of § 2669(c). *Id.* Indeed, because there are no other "individuals" mentioned in the section, there is no other antecedent to which the word "such" could refer.[14]

Section 408, however, is not a law concerning individuals who -- like Miller -- are "employed by contract to perform" services abroad under § 2669(c). Instead, section 408 authorizes the Secretary to establish compensation plans for individuals "employed under section 3951(c)(1)." 22 U.S.C. § 3968(a)(1). In turn, that referenced section, § 3951(c)(1), together with another, § 3951(a), authorizes the appointment under yet another section -- that is, "under section 3943" -- of certain U.S. citizens "for employment in positions customarily filled by Foreign Service officers." *Id.* § 3951(a); *see id.* § 3951(c)(1). Altogether, then, section 408 authorizes the Secretary to establish compensation plans for U.S. citizens employed, under a combination of sections 3951 and 3943, in positions customarily filled by Foreign Service officers. But the government does not contend that Miller was employed in a position customarily filled by a Foreign Service officer. It also

---

[14]*See United States v. Bowen*, 100 U.S. 508, 512 (1879) (construing the phrase "such pensioners" as backward-looking in a statute where there was "no other class of pensioners described in that section to whom the word *such* can refer").

agrees that he was not appointed "under section 3951(c)(1)," "under section 3943," or under any combination thereof. Rather, as his employment agreement states, the "[s]tatutory authority for [Miller's] agreement is 22 U.S.C. 2669(c)." J.A. 23.[15] Indeed, even the Secretary acknowledges that section 408 does not apply to Miller "by its own terms." DOS Br. 22-23. Accordingly, because § 2669(c) only authorizes the Secretary to determine the applicability to employees like Miller of laws concerning employment by contract for services abroad, and because section 408 is not such a law, § 2669(c) does not authorize the Secretary to apply section 408 to Miller.[16]

Second, even if section 408 were applicable to employees like Miller, it is doubtful that it would permit the State Department to impose a mandatory retirement age on such employees. Section 408 does not mention retirement at all. It does authorize the Secretary to "establish compensation . . . plans," based (inter alia) on "compensation practices" for corresponding types of positions in the locality of employment. 22 U.S.C. § 3968(a)(1). But mandatory retirement is not a "compensation" plan or practice, particularly given that the elements of compensation expressly mentioned in section 408

---

[15]*See also* Rule 28(j) Letter from DOS Counsel at 2 (filed Oct. 17, 2011) ("Mr. Miller is neither a foreign service nor a civil service employee of the Department of State. Rather, Mr. Miller was hired by contract under Section (c) [of § 2669] and is thus referred to by the Department as a 'personal services contractor.'").

[16]*Compare* 22 U.S.C. § 3968(a)(1) (section 408), *with* 22 U.S.C. § 4343(b) (authorizing the Secretary to promulgate regulations concerning the disposition of personal property by "contractors [who] enjoy importation or tax privileges in a foreign country"). *See generally id.* § 4341 (defining the term "contractor" for purposes of § 4343(b) to mean, inter alia, "an individual employed by personal services contract pursuant to section 2669(c) of this title").

are such things as "wage rates," participation in "local social security plans," and "leaves of absence with pay." *Id.*[17] Section 408 further provides that, for local compensation plans, "the Secretary shall define those *allowances and benefits* provided under United States law which shall be included as part of the total compensation package." *Id.* (emphasis added). But it is difficult to characterize forced retirement as an "allowance" or "benefit."

In sum, the State Department's winding tour through the U.S. Code fails to convince us that the second clause of section 2(c) of the Basic Authorities Act, 22 U.S.C. § 2669(c), gives it the authority to fire Miller solely because he turned sixty-five. Neither that clause; nor section 408 of the Foreign Service Act, which the Department says the clause refers to; nor the further sections of the Foreign Service Act that section 408 itself references; speak with the kind of clarity one would expect if Congress had intended to remove the protections of landmark legislation like the ADEA from a class of U.S. citizens.

C

The third and final clause of § 2669(c) provides:

> and such contracts are authorized to be negotiated, the terms of the contracts to be prescribed, and the work to be performed, where necessary, without regard to such statutory provisions as relate to the negotiation, making, and performance of contracts and performance of work in the United States.

---

[17]*See also* 3 Foreign Affairs Handbook 2 § H-214(C) (characterizing "compensation" terms in personal services contracts as terms that deal with "pay and benefits").

22 U.S.C. § 2669(c). The State Department maintains that "[t]he plain language" of this provision "expressly permits the Secretary to enter into employment contracts with individuals like Miller without regard to statutory provisions *such as* the ADEA," because the ADEA is "clearly a statutory provision that 'relate[s] to the negotiation, making, and performance of contracts and performance of work in the United States.'" DOS Br. 11 (emphasis added). Our dissenting colleague sees similar clarity. *See* Dissent at 1, 5, 15-16. But the matter is not nearly so "plain," "express," or "clear" as both insist.

1. The text of § 2669(c)'s third clause does not contain the kind of language one would expect Congress to use if its intention were to abrogate an antidiscrimination provision like the ADEA. The clause does not mention the ADEA. Nor, in contrast to the statutory provisions this court examined in *Strawberry* and *Stewart*, does it refer to age considerations or age-based retirement. *See supra* Part II.A.2. Indeed, the third clause does not speak in the language of antidiscrimination statutes at all. To be sure, statutes like the ADEA are part of the backdrop of employer-employee relations in the United States. But rather than generally setting standards for "the negotiation, making, and performance of contracts," 22 U.S.C. § 2669(c), the ADEA provides that "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on age," 29 U.S.C. § 633a(a). Moreover, the ADEA does not deal with the "performance of work" by protected employees; rather, it prohibits employers from discriminating against employees for a reason -- age -- that is *unrelated* to the actual performance of their work.[18]

---

[18]This accounts for the ADEA provisions and antidiscrimination case law that the dissent cites as "speak[ing] in terms of performance of work," Dissent at 5 n.5. *See, e.g.*, 29 U.S.C. § 621(a)(2) (expressing Congress' concern that "the setting of arbitrary age limits

This is not to say that it would be impossible to think of a law that bans age discrimination in personnel actions as one that broadly "relate[s] to the negotiation, making, and performance of contracts and performance of work in the United States." But if the ADEA is such a law, so too is Title VII of the Civil Rights Act of 1964, which in parallel language provides that "[a]ll personnel actions affecting employees or applicants for employment" by the federal government "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a); *see McKennon*, 513 U.S. at 357 (noting that the "substantive, antidiscrimination provisions of the ADEA are modeled upon the prohibitions of Title VII"). So too is the ADA, which bars discrimination "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The State Department does not dispute the point. *See* Oral Arg. Recording at 23:30-23:40 (statement by State Department counsel that "the term 'performance of work' relates to statutes such as . . . Title VII"). Yet, although we may be naive, it is hard for us to imagine that Congress would have hidden such a dramatic exemption from its landmark antidiscrimination laws in the anodyne language of § 2669(c)'s third clause.

---

*regardless of potential for job performance* has become a common practice" that "may work to the disadvantage of older persons" (emphasis added)); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) (noting that because Congress found that "as an overall matter, the performance of work of older workers was at least as good as that of younger workers," the ADEA "commands that employers are to evaluate older employees on their merits and not their age" (internal citations and quotation marks omitted)).

Moreover, if the ADEA is a law that "relate[s] to the negotiation, making, and performance of contracts and performance of work," so too are the laws "administered by the Office of Personnel Management" referenced in the first clause of § 2669(c). *See supra* Part III.A.[19] But that would leave the first clause's exemption of § 2669(c) employees from the coverage of OPM-administered statutes without any independent effect. Such an interpretation would violate "[a] cardinal principle of interpretation [that] requires us to construe a statute so that no provision is rendered inoperative or superfluous, void or insignificant." *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469, 472 (D.C. Cir. 2009) (internal quotation marks omitted); *see Hibbs v. Winn*, 542 U.S. 88, 101 (2004).

2. There is, however, a narrower reading of § 2669(c)'s third clause that does not require us to conclude that Congress intended, by opaque language, to authorize the State Department to act "without regard to . . . statutory provisions" that protect U.S. citizens against discrimination based on their age, disability, race, religion, or sex. Likewise, this reading preserves an independent meaning for the section's first clause. Most important, it is the more natural reading of the statutory language.

The more natural reading is to regard "provisions relating to the negotiation, making and performance of contracts and performance of work" as referring to the complex of statutes and regulations that establish government-wide requirements for federal contracting and procurement. This reading is confirmed

---

[19]OPM is charged, inter alia, with "executing, administering, and enforcing -- (A) the civil service rules and regulations of the President and the Office and the laws governing the civil service; and (B) the other activities of the Office including retirement and classification activities." 5 U.S.C. § 1103(a)(5).

by the manner in which Congress previously used the same language that is now enshrined in the text of 2669(c)'s third clause.  As even the most casual comparison discloses, that language is copied directly from the text of an earlier statute, the Foreign Service Buildings Act of 1926, 22 U.S.C. § 294, which provides:

> The *contracts* for purchases of buildings, for leases, and for all work of construction, alteration, and repair under this chapter *are authorized to be negotiated, the terms of the contracts to be prescribed, and the work to be performed, where necessary, without regard to such statutory provisions as relate to the negotiation, making, and performance of contracts and performance of work in the United States* . . . .

22 U.S.C. § 294 (emphasis added).  The language we have italicized constitutes all but two of the words contained in the third clause of § 2669(c).  (The additional words are "and" and "such.")  It has never been regarded as authorizing an exception from the protections of statutes that bar discrimination based on age, disability, race, religion, or sex.  Rather, the language of the Foreign Service Buildings Act has been viewed as authorizing an exemption from the Federal Acquisition Regulation (FAR) and its web of regulatory and associated statutory provisions governing the acquisition by federal agencies of supplies and services.  *See* 48 C.F.R. §§ 1.000 *et seq.*

Provisions of the FAR deal in detail with the negotiation, making, and performance of contracts, and with the performance of work.[20]  Part 37 specifically addresses services contracts.  *See*

---

[20]*See, e.g.*, 48 C.F.R. Part 15 ("Contracting by Negotiation"); *id.* Part 52 (model contract terms); *see also, e.g.*, *id.* §§ 15.000-15.609, 16.103, 36.214, 36.606 (relating to negotiation); *id.* §§ 13.000-13.501,

48 C.F.R. Part 37. The FAR itself is statutorily mandated, its promulgation having been expressly required by 41 U.S.C. § 1303(a)(1). That section directs that the Administrator of General Services, together with the Secretary of Defense and the Administrator of NASA, "shall jointly issue and maintain . . . a single Government-wide procurement regulation, to be known as the 'Federal Acquisition Regulation.'" 41 U.S.C. § 1303(a)(1). Other statutory provisions prescribe parts of the FAR's contents,[21] and still others compel agency compliance with the FAR.[22] Indeed, Title 41 of the United States Code is composed of hundreds of statutory provisions regulating public contracting for both supplies and services, including sections regarding contract procurement, terms, awards, and disputes[23] -- many of which mirror provisions of the FAR.[24]

---

14.000-14.503, 19.000-19.1506, 31.000-31.703, 50.102-50.103 (relating to making of contracts); *id.* §§ 5.102, 7.503, 9.104-1, 15.305, 25.801 (relating to performance of contracts); *id.* §§ 19.1308-09, 36.501, 52.223-6, 52.236-8, 52.249-2 (relating to performance of work). *See generally id.* § 2.101 (defining "acquisition" for purposes of the FAR as "the acquiring by contract . . . of supplies or services[,] . . . "begin[ning] at the point when agency needs are established," and extending through "award of contracts" and "contract performance").

[21]*See, e.g.*, 41 U.S.C. §§ 1502(f), 1901, 2310(b), 3302(c), 4305(a), 4710(b), 4711(b).

[22]*See, e.g.*, *id.* § 1121(c) (requiring executive agencies to follow the FAR in the procurement of property and services); *id.* § 3101(a) (same).

[23]*See* 41 U.S.C. §§ 3101-3509 (procurement); *id.* §§ 6502, 6703, 8303, 8703 (terms); *id.* §§ 3701-08 (awards); *id.* §§ 7101-09 (disputes).

[24]*Compare* 41 U.S.C. § 3305, *with* 48 C.F.R. Part 13 (establishing simplified acquisition procedures); 41 U.S.C. §§ 4501-06, *with* 48

Given the nature of the contracting requirements contained in the FAR and associated statutes, it is unsurprising that they have been identified as the subject of the exception authorized by the Buildings Act. The FAR itself interprets "section 3 of the Foreign Service Buildings Act of 1926, as amended (22 U.S.C. 294)" as providing that "[c]ontracts for overseas construction . . . may be excepted where necessary from the provisions of the FAR." 48 C.F.R. § 636.101-70. The State Department has also viewed the Buildings Act as creating an exemption from the FAR and its associated statutes for embassy procurements. *See In re Flexsteel Indus., Inc.*, B-221192, at 2 (Comp. Gen. Apr. 7, 1986). Similarly, the U.S. Court of Federal Claims has cited the Buildings Act for the proposition that the FAR's "general requirement of a performance bond in construction contracts with the U.S. Government may be waived for construction contracts involving U.S. diplomatic missions abroad." *Egyptian Am. Bank, S.A.E. v. United States*, 13 Cl. Ct. 337, 343 (1987).

When Congress uses an identical string of forty-five words in two statutes, each of which authorizes the State Department to enter into contracts, it is reasonable to assume that the legislature intended both strings to have the same operative meaning. *Cf. Brown v. Gardner*, 513 U.S. 115, 118 (1994) (examining the use of the same term "in analogous statutes" to determine its meaning); *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987) (noting "[t]he presumption that similar language in two labor law statutes has a similar meaning"). Here, then, it is appropriate to read the language of the third clause of § 2669(c), like the language of section 3 of the Foreign Service Buildings Act, as a shorthand for authorizing the Secretary to

---

C.F.R. Part 32 (prescribing contract financing rules); 41 U.S.C. §§ 6701-07, *with* 48 C.F.R. Part 37 (discussing services contracts); *compare also* 41 U.S.C. § 131, *with* 48 C.F.R. § 2.101(b) (defining "acquisition" for statutory and regulatory purposes).

disregard the standard contracting requirements of the FAR and its associated statutes, including the requirements governing personal services contracts, *see* 48 C.F.R. §§ 37.104 *et seq.* This reading is buttressed by the State Department's own Foreign Affairs Manual, which cites § 2669(c) for the proposition that the Department may "[e]mploy individuals, for services abroad, under a contract which *is not subject to Federal Acquisition Regulations*." 3 Foreign Affairs Manual § 7113.1(a)(6) (emphasis added). Nowhere does the Manual invoke § 2669(c) for the broader proposition, claimed here, that the Department may hire and fire U.S. citizens abroad without regard to the basic mandates of federal antidiscrimination laws.

Nor is this narrower reading any less persuasive if we take the third clause's string of words apart and look only at the statutory phrase "performance of work." That phrase, even on its own, is also closely associated with the provisions of the FAR. It is frequently employed in the FAR itself; indeed, a Westlaw search discloses that the FAR uses the phrase one hundred times.[25] It is also frequently used by courts in

---

[25]*See, e.g.*, 48 C.F.R. § 19.1308 (establishing "[p]erformance of work requirements" relating to subcontracting); *id.* § 32.202-1(b)(6) ("Prior to any performance of work under the contract, . . . ."); *id.* § 36.501 (governing "[p]erformance of work by the contractor"); *id.* § 52.204-2(e) (demanding that contractor "exert every reasonable effort . . . to continue the performance of work . . . "); *id.* § 52.223-6 (referring to "site(s) for the performance of work"); *id.* § 52.236-1 (establishing model "Performance of Work by the Contractor" clause); *id.* § 52.249-6(a) (providing that "the Government may terminate performance of work under this contract"); *see also id.* §§ 2.101(b), 7.305(c), 27.300, 52.232-31, 52.236-8, 52.249-2(a). The phrase is also used several times in Title 41 itself. *See* 41 U.S.C. § 4505(c) (limiting "payments . . . in advance of any performance of work under the contract"); *id.* § 8101 (defining employee as an individual "directly engaged in the performance of work"); *id.* § 8303 (limiting

discussing the FAR's provisions.[26]

3. Notwithstanding § 2669(c)'s use of language indicating that it was intended to authorize an exemption from the FAR and associated statutes in Title 41, the State Department maintains that the legislative history of the section supports its broader construction. In fact, there is very little legislative history to examine, and the three snippets to which the Department points are even more ambiguous than the statutory language. Before getting to those snippets, however, we must remark upon what is most important about the legislative history: namely, what is *not* in it. If the third clause were truly intended to permit the Secretary to do something as consequential as disregard "statutory provisions *such as* the ADEA," DOS Br. 10 (emphasis added), one would expect to see a reference in that history to the ADEA, or to similar statutes such as the ADA or Title VII. There are no such references. Likewise, if it really were "clear . . . from [the] statutory history that the Secretary was permitted" to include a mandatory retirement clause in Miller's employment contract, *id.* at 12, one would expect the history to contain a reference to mandatory retirement, or at least to the application of age distinctions in some context. Again, there are no such references. "Congress'

_____

what materials contractors may use "in the performance of the work").

[26]*See, e.g.*, *Campbell Plastics Eng'g & Mfg., Inc. v. Brownlee*, 389 F.3d 1243, 1248 (Fed. Cir. 2004); *Redland Co., Inc. v. United States*, 97 Fed. Cl. 736, 747 n.4 (2011); *LB&B Assocs. Inc. v. United States*, 91 Fed. Cl. 142, 157 (2010); *Northrop Grumman Corp. v. United States*, 42 Fed. Cl. 1, 12 (1998); *see also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 75 n.2 (D.C. Cir. 1985); *Krygoski Constr. Co., Inc. v. United States*, No. 214-89C, 1993 WL 840295, at *7 (Ct. Fed. Cl. Mar. 2, 1993), *rev'd on other grounds*, 94 F.3d 1537 (Fed. Cir. 1996); *Blount, Inc. v. United States*, 22 Cl. Ct. 221, 226-29 (1990).

silence in this regard can be likened to the dog that did not bark." *Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991).

The third clause of § 2669(c) was added to the section in 1994 as part of a larger set of statutory amendments. *See* Foreign Relations Authorization Act, Fiscal Years 1994 & 1995, Pub. L. 103-236, 108 Stat. 382 (1994). The only specific mention of the third clause is found in the House Conference Report, which states that the clause "exempts, where necessary, contracts for personal services abroad from statutory *contracting provisions* applicable in the United States." H.R. Conf. Rep. No. 103-482, at 171 (1994) (emphasis added). As we have discussed above, "contracting provisions" is not an obvious way to refer to antidiscrimination statutes like the ADEA, ADA, and Title VII. By contrast, it is a perfectly natural way to refer to the FAR and its associated statutes, which are filled with provisions governing contracting by federal agencies. *See, e.g.*, 48 C.F.R. pts. 37, 52.

In addition to its single specific reference to the third clause, the Conference Report states that the entire set of 1994 amendments "allows the Secretary of State *greater flexibility* in hiring U.S. citizens, particularly family members of U.S. Government employees, at embassies and consulates abroad." H.R. Conf. Rep. No. 103-482, at 182 (emphasis added). The Report does not explain what kind of flexibility Congress had in mind. Lifting the labyrinthine restrictions of the FAR and Title 41 certainly fills that bill. But there is nothing in the legislative history to suggest that Congress wanted the Secretary to have "flexibility" to hire and fire without regard to the laws that bar employment discrimination.[27]

---

[27]In fact, the only thing that is clear about the sentence in the Conference Report regarding "flexibility" is that it is not in the main a reference to the addition of the third clause of § 2669(c) at all, but

Last, the government calls our attention to another passage in the Conference Report, which "urges the Department of State to undertake . . . a review of U.S. laws and regulations that may impede the ability of American citizens abroad to compete in world markets with citizens of other nations on a level playing field." *Id*. On its face, however, this passage refers to a review Congress wanted the Department to undertake, not to something it thought the third clause would accomplish. Moreover, in context it appears to have more to do with "making the United States more competitive in the world economy," *id.*, than with influencing hiring at U.S. facilities. Nonetheless, the State Department insists that the passage shows that Congress intended the third clause to authorize an exemption from the ADEA in order to promote the Department's own hiring of U.S. citizens abroad.

Even if the State Department were correct in reading this ambiguous passage as relating to State Department hiring, it is unclear how allowing the United States to discriminate against its own citizens on the basis of their age -- or disability, race, religion, or sex -- would promote the hiring of U.S. workers abroad. The Department's brief does not explain this claim at all. *See* DOS Br. 12. At oral argument, Department counsel suggested that, if U.S. employment discrimination laws were

---

rather to a different statutory amendment that is inapplicable to Miller. As quoted above, the sentence states that the set of amendments "allows the Secretary of State greater flexibility in hiring U.S. citizens, *particularly family members of U.S. Government employees*, at embassies and consulates abroad." *Id.* (emphasis added). The flexibility regarding the hiring of family members came not from the amendment to § 2669(c), but rather from an amendment to the Foreign Service Act that authorized the Secretary to "appoint United States citizens, who are family members of government employees assigned abroad[,] . . . for employment in positions customarily filled by Foreign Service officers." 22 U.S.C. § 3951(a).

applicable to U.S. citizens hired abroad under § 2669(c), State Department supervisors might prefer to hire foreign workers who are not protected by those statutes. Oral Arg. Recording 25:00-26:15. Our dissenting colleague proffers a similar explanation of his own. Dissent at 7-9.

This line of reasoning does not appear anywhere in the legislative history.[28] Nor is that surprising. It requires the assumption that State Department supervisors would prefer to hire employees against whom they are free to discriminate -- and that in the absence of a "level" playing field permitting them to discriminate against everyone, those supervisors would decline to hire U.S. citizens. Indeed, while it would be surprising for Congress to assume such callousness on the part of State Department officials, it is more than merely surprising to hear the Department make the same assumption about its own people. And that is doubly so in light of the Department's repeated declarations that it "provides equal opportunity and fair and equitable treatment in employment to all people without regard to race, color, religion, sex, national origin, age, disability, political affiliation, marital status, or sexual orientation." 3 Foreign Affairs Manual § 1511.1(a); *see id.* § 2211(a) ("The Department's policy is to recruit and select the best qualified employees available, without regard to age, race, color, religion,

---

[28]In support, the dissent offers an extensive footnote discussing a floor statement by Senator Rockefeller. Suffice it to say that the Senator did not make the argument made by the dissent. *See* 140 Cong. Rec. 565-66 (1994) (statement of Sen. Rockefeller). Nor did he refer at any point to a need to *permit* age (or any other kind of) discrimination by the State Department. *See id.* To the contrary, Senator Rockefeller made it clear that he wanted "to *eliminate* employment discrimination against Americans by the U.S. Department [of State]." *Id.* at 565 (emphasis added).

sex, national origin, politics, marital status, or physical handicap . . . .").[29]

In sum, we conclude that the legislative history's vague references to "flexibility" and "competitive[ness]" are insufficient to indicate a congressional intent to permit the State Department to discriminate against U.S. citizens hired abroad.

4.  Finally, we must say a few more words about the dissent, which supports the State Department's construction of the third clause of § 2669(c).

Our dissenting colleague notes that "our job is to apply and enforce the law as it is written," and charges that we have "not correctly performed that task."  Dissent at 1.  But in fact, both the dissenting opinion and ours are based on the law as it is written.  As we have said above, we do not disagree that the third clause can be read as the dissent reads it.  But because *Chevron* deference is inapplicable here -- a point the dissent does not dispute -- the question is which reading of the text is the better one.  For the reasons we have discussed in this Part, we conclude that ours is the better reading.

Much of the dissenting opinion is devoted to challenging what it describes as certain "inapposite interpretive

---

[29]By post-argument letter, counsel for the State Department advised the court that the above quotations from the Foreign Affairs Manual are found in provisions applicable to Foreign Service and civil service employees, and that Miller does not fall within those categories because he was hired under § 2669(c) as a "personal services contractor."  Rule 28(j) Letter from DOS Counsel at 2 (filed Oct. 17, 2011).  Nonetheless, the Department does not direct us to any provision of the Manual declaring that the Department's commitment to equal opportunity is inapplicable to U.S. citizens hired under § 2669(c).

presumptions" upon which it insists we rely. Dissent at 10; *id.* at 10-16. Those challenges, however, are aimed at straw men. We do not -- "implicitly" or otherwise -- invoke an "absurdity canon" that would allow us to disregard "the plain language of the statute" because it would lead to an absurd result. *Id.* at 12, 14. As we have explained, we do not think that the language of the third clause is "plain," and we do not think that the dissent's reading is absurd. Nor do we say that, to exempt federal agencies from the antidiscrimination laws, Congress must specifically list the laws it has in mind. *See id.* at 10-11. We merely say that it would be surprising if Congress had intended to authorize an exemption from the country's landmark antidiscrimination laws by using ambiguous terms that appear to refer to something else entirely. And because there is a less surprising and more natural reading of the statutory text, that is the reading we adopt.

In the end, this all comes down to one dispositive question: If Congress had intended to authorize the State Department to act without regard to the antidiscrimination laws, would it have done so using a string of forty-five words that has previously only been read to authorize a waiver of the regulatory and statutory provisions that govern federal contracting and procurement? We do not think so.

IV

As the Supreme Court has repeatedly reminded us, Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).[30] Exemptions from the statutory protections

---

[30]*See Bilski v. Kappos*, 130 S. Ct. 3218, 3250 (2010); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008); *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006).

afforded to U.S. citizens against discrimination by their own government are surely elephants. And the provisions the State Department cites as purportedly authorizing such exemptions are surely mouseholes -- and well-camouflaged ones at that.

The ADEA, which was enacted "as part of an ongoing congressional effort to eradicate discrimination in the workplace, reflects a societal condemnation of invidious bias in employment decisions." *McKennon*, 513 U.S. at 357. It is "but part of a wider statutory scheme," including Title VII and the ADA, enacted "to protect employees in the workplace nationwide." *Id.* Whenever Congress has decided to exempt either groups of U.S. citizens or specified circumstances from the coverage of those statutes, it has done so clearly. It has not hidden those decisions in obscure references that require trips through multiple statutes, only to end in still further ambiguous provisions. Nor has it hidden them in language previously used for another purpose. It did not do so here.

The judgment of the district court, granting the State Department's motion to dismiss Miller's ADEA claim, is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

KAVANAUGH, *Circuit Judge*, dissenting: John Miller worked as a safety inspector at the U.S. Embassy in Paris. His employment contract with the State Department required him to retire at age 65. After Miller turned 65 and the State Department forced him to retire, he sued and claimed that his mandatory retirement violated the Age Discrimination in Employment Act.

The problem for Miller is that federal law allows the State Department to maintain a mandatory retirement policy for personnel employed abroad. The relevant statute expressly authorizes the State Department to contract with American workers in foreign locations "without regard" to "statutory provisions" relating to the "performance of contracts and performance of work in the United States" – in other words, to contract with workers in foreign locations notwithstanding statutory provisions such as the ADEA that relate to the performance of contracts and performance of work in the United States. The State Department thus did not violate federal law when it required Miller to retire at age 65. In my view, this is not a close case, at least as a matter of law. I therefore would affirm Judge Huvelle's decision rejecting Miller's claim.

To be sure, Congress could (and perhaps should) change the law and bar the State Department from imposing mandatory retirement in these kinds of circumstances. Moreover, even under existing law, the President, the Secretary of State, and appropriate subordinate officers in the State Department could (and perhaps should) alter the current policy and no longer mandate retirement at age 65 for workers such as Miller. But our job is to apply and enforce the law as it is written. In my judgment, the majority opinion has not correctly performed that task. I respectfully dissent.

2

I

In 1996, the State Department hired John Miller, a U.S. citizen, to work as a supply supervisor at the U.S. Embassy in Paris, France. In 2003, Miller became a safety inspector. The State Department's 2003 contract with Miller incorporated all "provisions of the local compensation plan" governing employment of staff at the Embassy. J.A. 23. That local compensation plan included a "retirement" clause that stated: "Age 65 is the mandatory age limit for all employees . . . ." J.A. 26. Therefore, Miller's contract required retirement at age 65. When Miller turned 65, the State Department terminated his employment.

Miller claims that his forced retirement at age 65 violated the Age Discrimination in Employment Act.

In 1967, Congress enacted the ADEA to ban age discrimination by certain private employers (the law now applies to employers with 20 or more employees). *See* Pub. L. No. 90-202, 81 Stat. 602. In 1974, Congress extended the ADEA to federal agencies. *See* Pub. L. No. 93-259, § 28(b)(2), 88 Stat. 55, 74. The ADEA provision protecting federal agency employees states in relevant part: "All personnel actions affecting employees . . . who are at least 40 years of age . . . in executive agencies . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Applying that statute, courts have concluded that federal agencies generally may not require retirement based on age. *See, e.g.*, *Johnson v. Mayor and City Council of Baltimore*, 472 U.S. 353, 355-57 & n.1, 366 n.10 (1985); *Forman v. Small*, 271 F.3d 285, 297 (D.C. Cir. 2001).[1]

---

[1] In 1964, Congress enacted a similar statute, Title VII of the Civil Rights Act, to protect against employment discrimination by

However, there are numerous exceptions to the ADEA. *See, e.g.*, 29 U.S.C. § 623(f) (exceptions "where age is a bona fide occupational qualification" and where compliance with the ADEA would cause an employer "to violate the laws of the country in which [a] workplace is located"); 29 U.S.C. § 623(j) (exception for state firefighters and law enforcement officers); 29 U.S.C. §§ 628, 633a(b) (exceptions may be created by the Equal Employment Opportunity Commission); 29 U.S.C. § 630(b) (exception for small employers); 29 U.S.C. § 631(c) (exception for executives and high policymakers); 29 U.S.C. § 633a(a) (exception for judicial branch employees in the noncompetitive service); *see also, e.g.*, 5 U.S.C. § 8335 (mandatory retirement of air traffic controllers, law enforcement officers, firefighters, nuclear materials couriers, customs and border protection officers, Capitol Police, and Supreme Court Police); 22 U.S.C. § 4052 (mandatory retirement of foreign service officers); *Johnson*, 472 U.S. at 357; *Strawberry v. Albright*, 111 F.3d 943, 947 (D.C. Cir. 1997).

As those many examples show, statutory exceptions to the ADEA – including mandatory retirement provisions for certain federal employees – are quite common. This case presents another such exception.

As amended in 1994, the State Department Basic Authorities Act authorizes the State Department to employ U.S. citizens abroad without regard to the ADEA. *See* 22 U.S.C. § 2669(c).[2] In 1956, Congress initially passed the

_____

private employers on the basis of race, color, religion, sex, or national origin. *See* Pub. L. No. 88-352, §§ 701-716, 78 Stat. 241, 253-66. In 1972, Congress extended Title VII to federal agencies. *See* Pub. L. No. 92-261, § 11, 86 Stat. 103, 111.

[2] Since its initial enactment in 1974, the statute extending the ADEA to federal employees has exempted *aliens* employed abroad

4

State Department Basic Authorities Act. *See* Pub. L. No. 84-885, 70 Stat. 890; *see also* Pub. L. No. 98-533, § 303, 98 Stat. 2706, 2710 (1984). Before 1994, Section 2(c) of the Act authorized the State Department to employ individuals by contract for services abroad. In 1994, Congress amended Section 2(c) to add that

> such contracts are authorized to be negotiated, the terms of the contracts to be prescribed, and the work to be performed, where necessary, *without regard to such statutory provisions as relate to the negotiation, making, and performance of contracts and performance of work in the United States*.

Pub. L. No. 103-236, §§ 137, 180(b), 108 Stat. 382, 397, 416 (emphasis added); *see also* 22 U.S.C. § 2669(c).[3] The text of Section 2(c) as amended establishes that the State Department

---

from the ADEA. *See* 29 U.S.C. § 633a(a); *see also* Pub. L. No. 93-259, § 28(b)(2), 88 Stat. 55, 74.

[3] The entire text of Section 2(c) reads: "The Secretary of State may use funds appropriated or otherwise available to the Secretary to . . . employ individuals or organizations, by contract, for services abroad, and individuals employed by contract to perform such services shall not by virtue of such employment be considered to be employees of the United States Government for purposes of any law administered by the Office of Personnel Management (except that the Secretary may determine the applicability to such individuals of subsection (f) of this section and of any other law administered by the Secretary concerning the employment of such individuals abroad); and such contracts are authorized to be negotiated, the terms of the contracts to be prescribed, and the work to be performed, where necessary, without regard to such statutory provisions as relate to the negotiation, making, and performance of contracts and performance of work in the United States . . . ." 22 U.S.C. § 2669(c).

may negotiate employment contracts for services abroad without regard to U.S. employment laws.

In this case, the State Department's contract with Miller plainly fell within Section 2(c). First, the State Department employed Miller "by contract, for services abroad." And second, the ADEA is a "statutory provision[]" that relates to the "performance of contracts and performance of work in the United States."[4] Indeed, there is no dispute in this case that the ADEA is a statutory provision related to the "performance of contracts and performance of work in the United States."[5]

---

[4] The ADEA is also a "statutory provision[]" that relates to the "negotiation" and "making" of contracts and is therefore covered by Section 2(c) for that reason as well, meaning that the State Department's mandatory retirement policy is exempt from the ADEA for that additional reason. For ease of reference, the analysis will refer to "performance of contracts and performance of work."

[5] Nor could there be. The ADEA repeatedly speaks in terms of performance of work. *See* 29 U.S.C. § 621(a)(2) (finding by Congress that "the setting of arbitrary age limits regardless of potential for *job performance*" had become a common practice) (emphasis added); 29 U.S.C. § 622 note (Secretary of Labor and EEOC must conduct study "to determine whether physical and mental fitness tests are valid measurements of the ability and competency of police officers and firefighters to *perform the requirements of their jobs*" and EEOC must propose guidelines "for the administration and use of physical and mental fitness tests to measure the ability and competency of police officers and firefighters to *perform the requirements of their jobs*") (emphases added); 29 U.S.C. § 623 note (2000) (Secretary of Health and Human Services must conduct study and issue guidelines "for the administration and use of physical and mental fitness tests to measure the ability and competency of law enforcement officers and firefighters to *perform the requirements of the jobs* of the officers and firefighters") (emphasis added); 29 U.S.C. § 633a(b)

The majority opinion itself acknowledges that the ADEA is "part of the backdrop of employer-employee relations in the United States" and seems to accept that the ADEA is therefore a law relating to the performance of contracts and performance of work. Maj. Op. at 23-24.

---

("Reasonable exemptions to the provisions of this section may be established by the Commission but only when the Commission has established a maximum age requirement on the basis of a determination that age is a bona fide occupational qualification necessary to the *performance of the duties of the position*.") (emphasis added).

Case law frequently refers to the ADEA as a statutory provision relating to the performance of work. *See, e.g.*, *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610-11 (1993) ("Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes. . . . [T]he available empirical evidence demonstrated that arbitrary age lines were in fact generally unfounded and that, as an overall matter, *the performance of older workers* was at least as good as that of younger workers.") (emphasis added) (internal quotation marks omitted); *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010) (age discrimination claim under ADEA requires inquiry into whether plaintiff was "(1) within the protected class of individuals 40 or older[;] (2) *performed satisfactory work*; (3) terminated from employment; and (4) replaced by a younger person") (emphasis added); *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (hostile work environment claim under ADEA requires inquiry into "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with *an employee's work performance*") (emphasis added) (citation omitted).

And in analyzing a similarly worded statute, the Supreme Court directly stated that Title VII is a statutory provision related to the performance of contracts. *Patterson v. McLean Credit Union*, 491 U.S. 164, 177 (1989); *see also id.* at 176-82.

In short, the text of Section 2(c) of the State Department Basic Authorities Act authorized the State Department to require Miller to retire at age 65, notwithstanding the ADEA.

To the extent it's relevant, the legislative history further demonstrates that Section 2(c) allows the State Department to employ U.S. citizens abroad without regard to the ADEA. In the years leading up to the 1994 amendment to Section 2(c), embassies and other State Department outposts abroad could hire foreign nationals in accordance with local wage rates and other compensation practices, but they generally could not do the same for American citizens working abroad. *See* 140 Cong. Rec. 564-67 (1994) (statement of Sen. Rockefeller). And before the 1994 amendment, the State Department could require foreign workers to retire at age 65, but it could not require American workers to retire at age 65.

The legislative history of the 1994 amendment reveals that, because of the different rules for foreign and American workers that gave the State Department greater flexibility to hire and fire foreign workers, the State Department was hiring foreigners instead of Americans. Unhappy with that turn of events, Congress decided to exempt the State Department from certain employment laws when the Department employed U.S. citizens at foreign locations. The Conference Report described Congress's intent to give the State Department "greater flexibility" in hiring U.S. citizens abroad. H.R. Rep. No. 103-482, at 171, 182 (1994) (Conf. Rep.). The Conference Report explained that Congress wanted to "ensure that everything possible is being done to enable American citizens abroad to compete on a most favored competitor basis" and encouraged the State Department to review "U.S. laws and regulations that may impede the ability of American citizens abroad to compete in world markets with citizens of other nations on a level playing

field." *Id.* at 182.[6]  In other words, so as not to disadvantage American workers, Congress exempted the State Department from various U.S. employment statutes (from which foreign workers already were exempt) and thereby enabled Americans to better compete with foreigners when seeking positions at embassies abroad.

One might well ask:  Why didn't Congress in 1994 level the playing field in a different way – by extending U.S.

---

[6] Similarly, Senator Rockefeller, who offered the amendment, explained that it was "designed to level the playing field when it comes to employment opportunities for U.S. citizens living in other countries."  140 Cong. Rec. 565 (1994) (statement of Sen. Rockefeller).  The State Department had complained that "discrimination existed because the Foreign Service Act of 1980 did not give foreign affairs agencies the authority to hire Americans residing abroad under the compensation plans used to pay other employees in local-hire positions."  *Id.*  Senator Rockefeller intended that his amendment "give the Secretary of State clear authority . . . to pay [Americans] under the same compensation systems used to pay others hired for these positions."  *Id.* at 566. He believed that his amendment would provide "the flexibility the State Department believes it needs to adjust to the special employment conditions that exist in the hundreds of different Foreign Service posts where these new job opportunities for Americans exist."  *Id*.

The majority opinion brushes aside those passages of the legislative history because they refer to other statutory amendments as well as to Section 2(c). *See* Maj. Op. at 31 & n.27.  But both the Conference Committee and Senator Rockefeller included the amendment to Section 2(c) with the amendments to the Foreign Service Act – suggesting that whatever effect the amendments to the Foreign Service Act were intended to have, the amendment to Section 2(c) was intended to have as well.  What was that effect? Greater flexibility for the State Department and a level playing field for Americans working abroad.

employment laws to foreign workers at State Department posts abroad rather than by declining to apply U.S. employment laws to American workers at State Department posts abroad?  Recall that as of 1994, the ADEA had long exempted aliens employed abroad from its protections.  That exemption for aliens employed abroad apparently stemmed from a desire to avoid conflict with foreign nations.  Foreign nations might take offense if the United States as an employer afforded citizens of foreign nations protections different from those usually provided in that foreign nation.  Moreover, the Foreign Service Act had long authorized the State Department to pay foreign workers overseas according to "local compensation plans."  22 U.S.C. § 3968.  Pursuant to those plans, foreign workers received wages and were subject to compensation practices that were typical of the host country.  That was in order to "eliminate complaints from host governments and employees over compensation issues" and to improve morale.  S. Rep. No. 96-913, at 41 (1980).  It also avoided "undesirable litigation which would result from failure to comply with certain labor laws and practices in foreign countries."  *Id.*; *see also* 3 Foreign Affairs Handbook 2, at H-212 D (2003) ("Posts must adhere to local labor, employment and social security laws to the maximum extent practicable" in matters that affect foreign national employees).

Apparently for those reasons, when amending the Basic Authorities Act in 1994, Congress did not extend U.S. employment laws to foreign workers.  Rather, to level the playing field and give American workers a fair chance to compete for those jobs at State Department posts abroad, Congress instead exempted American workers abroad from those U.S. employment laws.

10

\* \* \*

In short, the text of Section 2(c) of the State Department Basic Authorities Act, as amended in 1994, authorized the State Department to mandate retirement at age 65 for workers such as Miller.  I therefore would affirm the District Court's dismissal of Miller's suit.  This is not a close call.

II

The majority opinion comes to a contrary conclusion by downplaying the relevant statutory text, stacking the deck with inapposite interpretive presumptions, and raising the specter of rampant race, sex, and religious discrimination by the U.S. State Department against U.S. citizens employed abroad.  In my view, all of that is a smokescreen – on close inspection, none of the majority opinion's arguments holds up.

*First*, the majority opinion repeatedly points out that the text of Section 2(c), the general statutory authorization for the State Department to hire and fire abroad without regard to other U.S. employment laws, does not *specifically* refer to the ADEA or age-based employment decisions.  But Section 2(c) plainly gives the Secretary discretion to negotiate employment contracts for workers abroad without regard to statutes relating to the performance of contracts and performance of work in the United States.  The ADEA is quite obviously such a statute.  End of case.

Contrary to the majority opinion's suggestion, there is no "plain statement" requirement that Congress must meet to exempt federal agencies from the ADEA.  The Supreme Court has repeatedly stated that courts should generally adhere to a statute's text.  That cardinal principle applies to broadly worded statutes; Congress does not have to specifically

address subsidiary issues encompassed by broad statutory wording. Under the majority opinion's theory, by contrast, a statute exempting "animals" from a statutory ban on swimming in a river wouldn't apply to dogs because the statute didn't specifically refer to dogs. That's not how courts interpret laws. *See, e.g.*, *DePierre v. United States*, 131 S. Ct. 2225, 2235 (2011) (Congress chose "a statutory term that would encompass all forms" of chemically basic cocaine; Court refused to read that term as only encompassing one form); *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 226 (2008) ("'any other law enforcement officer' sweeps as broadly as its language suggests"); *Norfolk & Western Railway Co. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 129-34 (1991) (phrase "all other law" means all other laws); *Acree v. Republic of Iraq*, 370 F.3d 41, 62 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) ("[P]laintiffs err in their assumption that the government must somehow prove that Congress intended the statute's broad terms to be construed broadly. The burden is precisely the opposite: the party seeking to narrow the application of the statute must demonstrate that Congress intended something less than what the law on its face says.") (citations omitted); *Consumer Electronics Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) (Roberts, J.) ("the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application").

*Second*, the majority opinion suggests that Congress could not possibly have intended to permit mandatory retirement policies for U.S. citizens working abroad for the State Department. *See, e.g.*, Maj. Op. at 7 (State Department's argument faces "an uphill climb" given "the importance Congress ascribed to the ADEA"); *id.* at 8 ("We simply do not believe [Congress] would have authorized the

State Department to ignore statutory proscriptions against discrimination . . . through the use of ambiguous language."); *id.* at 24 ("it is hard for us to imagine that Congress would have hidden such a dramatic exemption from its landmark antidiscrimination laws in the anodyne language of § 2669(c)'s third clause"); *id.* at 33 ("it would be surprising for Congress to assume such callousness on the part of State Department officials").

Although the majority opinion does not explicitly use the term, the majority opinion is necessarily applying a form of the absurdity canon and saying that it would be absurd to read the broad statutory language to allow mandatory retirement policies for U.S. citizens working abroad for the State Department. The absurdity canon allows courts to disregard statutory text when adhering to the text "would result in a disposition that no reasonable person could approve." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 234 (2012). But the canon "can be a slippery slope. It can lead to judicial revision of public and private texts to make them (in the judges' view) more reasonable." *Id.* at 237. The hurdle for invoking the canon is thus "a very high one." *Id.* It applies only when "the absurdity and injustice of applying the provision to the case would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application." *Id.* (quoting 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 427 (1833)).

In this case, the majority opinion has not come close to showing that adhering to the plain language of the statute would be absurd. After all, mandatory retirement provisions, although generally forbidden by the ADEA and questionable as a policy matter in some circumstances, are quite common in both federal and state government. For example, on the

federal side, air traffic controllers, law enforcement officers, firefighters, and customs and border protection officers are subject to mandatory retirement. *See* 5 U.S.C. § 8335; *see also* 10 U.S.C. §§ 1251-1263 (mandatory retirement of military officers); 22 U.S.C. § 4052 (mandatory retirement of foreign service officers). At the state level, many law enforcement officers, firefighters, and judges, among others, face mandatory retirement. *See, e.g.*, 29 U.S.C. § 623(j) (permitting states and localities to mandate retirement of state firefighters and law enforcement officers); *Gregory v. Ashcroft*, 501 U.S. 452, 455 (1991) (mandatory retirement of Missouri judges). In light of these many mandatory retirement statutes, it cannot be deemed absurd to think that Congress would also permit an exception to the ADEA for U.S. citizens employed at State Department posts abroad.

Viewing the matter more broadly, the majority opinion's intimation that it would be absurd to read the statute as written is necessarily premised on an assumption that the anti-discrimination statutes currently extend to every nook and cranny of American workforces – and that an exception here therefore would be especially extraordinary. That assumption, too, is wrong. Congress has devised a wide variety of limits and exceptions to the anti-discrimination statutes. For example, the ADEA and Title VII do not apply to small employers – generally those with fewer than 15 or 20 employees. *See* 29 U.S.C. § 630(b); 42 U.S.C. § 2000e(b). A significant number of American workers are employed at such small businesses – something like 20 million American workers according to the latest statistics. *See* Bureau of Labor Statistics, U.S. Dep't of Labor, Distribution of Private Sector Employment by Firm Size Class. Courts likewise have determined that the ADEA and Title VII do not apply to uniformed personnel in the armed services. *See, e.g.*, *Hedin v. Thompson*, 355 F.3d 746, 747-48 & n.2 (4th Cir. 2004).

14

Put simply, Congress has seen fit to allow numerous exceptions to the ADEA. Those exceptions flatly refute the majority opinion's intimation that it would be exceptional to apply the text as written here.

In implicitly invoking a form of the absurdity canon, the majority opinion relatedly suggests that allowing the State Department to terminate workers abroad at age 65 would lead to unbridled State Department discrimination on the basis of not only age, but also race, sex, and religion – and that Congress could not have intended such a result. But that is a red herring because the majority opinion's premise is wrong. The inapplicability of the ADEA and other anti-discrimination legislation to State Department workers abroad does not license the State Department to discriminate against American workers abroad on the basis of race, sex, or religion. The State Department must act within the limits of the Constitution. The Due Process Clause of the Fifth Amendment bars the Federal Government from discriminating on the basis of race in employment. *See Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 105 (2001). The Fifth Amendment likewise forbids invidious sex discrimination in federal government employment. *See Tuan Anh Nguyen v. INS*, 533 U.S. 53, 60 (2001). Meanwhile, both the First and Fifth Amendments – as well as Article VI of the Constitution – bar the federal government from discriminating on the basis of religion in employment. Contrary to the majority opinion's stated fears, a ruling in favor of the State Department here would not license the Department to engage in unbridled race, sex, and religious discrimination against its American employees abroad.[7]

---

[7] The majority opinion agrees that the Constitution forbids race, sex, and religious discrimination in federal government employment. *See* Maj. Op. at 8-9. But the majority opinion

Based on the majority opinion's two main assertions – that in Section 2(c) Congress did not expressly refer to the ADEA and that it would be absurd, in the majority opinion's view, to read Section 2(c) to allow mandatory retirement policies – the majority opinion says it's better to read Section 2(c) as referring only to statutes that establish government-wide requirements for federal contracting and procurement. But where in the statutory text is that limitation? If Congress had wanted to limit Section 2(c) in that manner, it presumably would have said so. It did not. The majority opinion is simply making up a statutory boundary that Congress did not set forth in the enacted text.

In my view, we should not try to snatch ambiguity from clarity. We should just read Section 2(c) as it's written. The statute is not remotely ambiguous or difficult to apply in this

---

expresses doubt whether the Constitution affords remedies to federal government employees who are victims of such employment discrimination. The Constitution does afford such remedies. Courts have long held that citizens facing unconstitutional conduct can seek equitable relief – for an employee facing unconstitutional discrimination, equitable relief could include an injunction prior to termination or reinstatement subsequent to termination. *See, e.g.*, *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3138, 3151 n.2 (2010); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("it is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"). In the absence of other available remedies, such employees also may have *Bivens* claims for damages; the Supreme Court has recognized a *Bivens* remedy in a similar situation. *See Davis v. Passman*, 442 U.S. 228, 245-49 (1979) (when anti-discrimination legislation did not apply and equitable relief was unavailable, plaintiff alleging employment discrimination on the basis of sex had cause of action for damages under the Fifth Amendment).

case. The statute authorizes the Secretary to negotiate employment contracts for American workers abroad without regard to statutory provisions relating to the performance of contracts and performance of work in the United States. The ADEA is a statute relating to the performance of contracts and performance of work in the United States – and the majority opinion never seriously denies that point. That basic analysis resolves the case. Although I might disagree with the lines Congress has drawn in this statute, it is our job to respect those lines, not to re-draw them as we might prefer.[8]

\* \* \*

To sum up, the text of the statute makes this a straightforward case, as a matter of law. That statutory text authorized the State Department to include a mandatory retirement provision in its contract with Miller. Therefore, I

---

[8] The parties and the majority opinion have addressed this case on an assumption that the ADEA's federal agency provision applies at U.S. embassies in foreign countries. For future reference, I note here that the issue is undecided and that 29 U.S.C § 633a might not apply extraterritorially. That is because there is a longstanding presumption against the extraterritorial application of statutes. *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2878 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."). Embassies likely would be considered extraterritorial for these purposes. *Cf., e.g.*, *United States v. Gatlin*, 216 F.3d 207, 214 n.9 (2d Cir. 2000); *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 588 (9th Cir. 1983); 1 OPPENHEIM'S INTERNATIONAL LAW § 499 & n.4 (Robert Jennings & Arthur Watts eds., 9th ed. 1996); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 466 cmts. a, c (1987); *see also Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285-86 (1949); *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 383-90 (1948). *See generally EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991).

would affirm the judgment of the District Court. I respectfully dissent.