# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 24, 2015      Decided September 18, 2015

No. 14-1045

SSC MYSTIC OPERATING COMPANY, LLC, DOING BUSINESS AS
PENDLETON HEALTH & REHABILITATION CENTER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 14-1089

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*J. Michael McGuire* argued the cause and filed the briefs for petitioner.

*Kellie Isbell*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Julie B. Broido*, Supervisory Attorney, and *Jared D. Cantor*, Attorney.

Before: GRIFFITH and SRINIVASAN, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Concurring opinion filed by *Circuit Judge* SRINIVASAN.

Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

GRIFFITH, *Circuit Judge*:

After agreeing to a representation election in which the union prevailed, employer SSC Mystic challenged the results. For the reasons set forth below, we reject each of Mystic's arguments and affirm the decision of the National Labor Relations Board upholding the outcome.

I

SSC Mystic (Mystic) operates Pendleton Health & Rehabilitation, a nursing home in Mystic, Connecticut. On February 25, 2013, the Service Employees International Union, Local 1199 (Union), filed a petition with the National Labor Relations Board (NLRB) seeking to represent nurses at the facility. In response, the NLRB Regional Director issued a Notice of Election. The Union and the company entered a Stipulated Election Agreement that, among other things, provided that either party could ask the Board to review any decision the Regional Directors made. *See* 29 C.F.R. § 102.69(c).

Mystic vigorously opposed the Union. Its campaign included posting anti-union material in the workplace and sending the material by mail to employees' homes. Mystic

also held meetings at work to make the case against the Union to its employees, who were required to attend. It also distributed anti-union bracelets for employees to wear.

Separately, a supervisor named Diane Mackin engaged in a campaign of urging employees to sign Union authorization cards and to vote for the Union in the election. She frequently discussed the virtues of organizing. To those who opposed the Union, Mackin would speak coldly or refuse to speak at all. Mackin also claimed that the Union would help her get her job back if Mystic fired her for her advocacy.

After an employee reported Mackin's pro-union conduct to management, the company reprimanded her on March 12, 2013. Mystic explained to Mackin that her conduct violated her professional responsibilities as a supervisor and, more seriously, might be illegal pressure on employees in violation of the National Labor Relations Act (NLRA). Mystic warned Mackin that she would be fired if she did not end her support for the Union. Mystic then posted a notice in the workplace acknowledging, without identifying Mackin by name, that a supervisor had been involved in electioneering advocacy on behalf of the Union. In an effort to limit any effect Mackin's conduct may have had on employees' plans to vote, the notice explained that neither the company nor its supervisors intended to place pressure on employees. Despite all this, Mackin continued to openly advocate for the Union in the election and Mystic fired her on March 19, 2013.

The election continued for the next sixteen days. On April 4, 2013, the Union won the election. Of the 112 employees in the bargaining unit, 104 voted in the election: 64 supported the Union while 40 opposed.

Mystic filed objections to the election with the NLRB arguing principally that Mackin's conduct had tainted the election so thoroughly that its result should be set aside. Mystic also alleged that Mackin was acting as an agent of the Union when she "polled" employees, or interrogated them regarding their support for the Union in a way that could coerce them and infringe on their free choice. Because Mackin was allegedly acting as a Union agent, the company argued that the Union should be held responsible for that misconduct.[1] Finally, Mystic insisted, relying on our decision in *Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013),[2] that the NLRB lacked a quorum because three of its members had been placed in their posts through unconstitutional recess appointments and so had no authority to conduct the election at all.

On May 8 and 9, 2013, an NLRB Hearing Officer held a hearing to consider Mystic's objections. A party to a representation proceeding may apply for and receive a subpoena for the production of any evidence. 29 C.F.R. § 102.31. Exercising that power, Mystic subpoenaed any records of telephone calls between Mackin and the Union organizer assigned to the election. The Union opposed this subpoena. Mystic argued that it needed these records to prove that Mackin was a Union agent when she coercively interrogated employees regarding their support for the Union.

---

[1] Mystic also originally claimed that Mackin had threatened the job security of employees who did not support the Union and had accused the company of criminal behavior. Mystic has abandoned these arguments on appeal.

[2] After Mystic filed its objections with the NLRB and after both the Hearing Officer and the Board made their decisions, the Supreme Court affirmed our judgment in *Noel Canning* but on different grounds. *See NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014).

The Hearing Officer refused to enforce the subpoena, concluding that records could not prove that Mackin was acting as the Union's agent. Instead, the Hearing Officer directed the Union to produce the organizer himself to testify about his relationship with Mackin. The Union did not do so. Neither the parties nor the Hearing Officer mentioned the subpoena or the organizer again on the record.

At the close of the hearing, the Hearing Officer upheld the election result, concluding that even though Mackin had exerted impermissible pressure on employees, her misconduct had not materially affected the outcome of the election. The Hearing Officer also rejected Mystic's argument that Mackin was acting as a Union agent, reasoning that the company had failed to present any evidence supporting its claim. Finally, the Hearing Officer concluded that the Board should continue conducting elections and adjudicating disputes until the Supreme Court decided the legality of the Board's composition in *Noel Canning*.

Mystic filed objections to the Hearing Officer's ruling with the Board, arguing that the Hearing Officer's findings and conclusion were in error. Nonetheless the Board ratified the Hearing Officer's legal and factual determinations and certified the election result. *SSC Mystic Operating Co.*, No. 01-RC-098982, 2013 WL 6252453 (Dec. 3, 2013) (unreported). The Board agreed with the Hearing Officer that Mackin's impermissible conduct had not affected the outcome of the election, especially on the ground that Mackin's activities were offset when Mystic "engaged in an extensive [anti-union] campaign that included a string of mandatory meetings during the critical period, the dissemination of [anti-union] literature via mailings, handouts, and postings, and the distribution of [anti-union] bracelets." *Id.* at *1 n.2.

Once the Board had certified the election result, the Union asked Mystic to bargain, but the company refused. Accordingly, the Union filed an unfair labor practice charge against Mystic, alleging that its refusal to bargain violated the NLRA. *See* 29 U.S.C. § 158(a)(1), (5) (prohibiting an employer from refusing to bargain with representatives of its employees or interfering with employees' rights to organize). The Board's General Counsel issued a complaint and moved for summary judgment. In response, Mystic argued that the Hearing Officer erred in refusing to enforce Mystic's subpoena and should have held that Mackin's conduct impermissibly contaminated the election. For the first time, Mystic also raised the argument that the Regional Director, as opposed to the Board itself, had no power to conduct the representation election because he could not exercise the Board's delegated authority when the Board had no quorum and could not act itself.

The Board granted summary judgment against Mystic on March 31, 2014. *SSC Mystic Operating Co. LLC d/b/a Pendleton Health & Rehab. Ctr.*, 360 N.L.R.B. No. 68 (2014). The Board rejected Mystic's arguments that the Hearing Officer had made substantive and procedural errors, finding that Mystic had not produced any arguments or evidence not already made and rejected when the Board certified the election result. The Board also rejected Mystic's new argument that the Regional Director lacked authority to administer this representation election because the Board lacked a quorum. The Board interpreted the statute to mean that the Regional Directors "remain vested with the authority to conduct elections," pursuant to the Board's original delegation of that authority in 1961, "regardless of the Board's composition at any given moment." *Id.* at *1 n.1.

Mystic filed a timely petition for review of the Board's order, and the Board cross-applied for enforcement. We have jurisdiction under 29 U.S.C. § 160(e), (f).

On appeal, Mystic raises three challenges, each with its own standard of review. First, Mystic argues that the Board could not interpret the NLRA to permit Regional Directors to continue conducting elections when the Board lacked authority to act due to lack of a quorum. Absent plain meaning to the contrary, a court is obliged to defer to an agency's reasonable interpretation of its statutory jurisdiction pursuant to the familiar *Chevron* doctrine. *City of Arlington v. FCC*, 133 S. Ct. 1863, 1870-71 (2013).

Second, Mystic argues that substantial evidence did not support the Hearing Officer's decision to certify the election results. We review the substance of NLRB decisions under a "highly deferential standard" and will set them aside only "if the Board 'acted arbitrarily or otherwise erred in applying established law to the facts at issue, or if its findings are not supported by substantial evidence.'" *Waterbury Hotel Mgmt., LLC v. NLRB*, 314 F.3d 645, 650 (D.C. Cir. 2003) (quoting *Plumbers & Pipe Fitters Local Union No. 32 v. NLRB*, 50 F.3d 29, 32 (D.C. Cir. 1995)).

Finally, Mystic challenges the Hearing Officer's refusal to enforce its subpoena. We review refusals to enforce subpoenas for abuse of discretion. *Joseph T. Ryerson & Son, Inc. v. NLRB*, 216 F.3d 1146, 1153 (D.C. Cir. 2000).

II

A

Mystic insists that the Regional Director did not have authority to conduct this election because the Board had no quorum at the time the representation election took place. We disagree; as we recently explained in *UC Health v. NLRB*, No. 14-1049, slip op. at 8-19 (D.C. Cir. 2015), we must defer to the Board's reasonable interpretation that the lack of a quorum at the Board does not prevent Regional Directors from continuing to exercise delegated authority that is not final because it is subject to eventual review by the Board.

As an initial matter, the Board argues that Mystic waived this argument by failing to raise it during the representation proceeding. The Board made the same argument in *UC Health*, and we rejected it there. We do so here for the same reasons: Our precedents make clear that a challenge to agency action based on the agency's lack of authority to take any action at all need not be raised below and may be made for the first time on appeal. *See UC Health*, No. 14-1049, slip op. at 6-7.[3] Nor do we agree with the Board that Mystic abandoned this argument when it executed the Stipulated Election Agreement. *Id.* at 7-8. Nonetheless, just as in *UC Health*, we disagree with Mystic on the merits of its claim. The Regional Director had authority to conduct this election even though the Board had no quorum. *See id.* at 8-19.

---

[3] We note that the employer in *UC Health* and in this case raised their objections to the authority of the Regional Director at different points in the administrative process. But these slight factual differences between the cases are immaterial because, as we explained in *UC Health*, our precedents make clear that an employer can raise for the first time on appeal a challenge to the authority of the Board to take any action at all, irrespective of whether the employer ever made that objection below. *See UC Health*, No. 14-1049, slip op. at 6-7.

Mystic makes one additional argument on this score that we did not confront in *UC Health*. Mystic insists that Regional Director Jonathan Kreisberg did not have authority to conduct this election even if the Regional Directors as a class could do so. In 2010, Kreisberg was appointed as the Regional Director for Connecticut, which was at that time Region 34 of the NLRB's regions. In 2012, while the Board lacked a quorum, the NLRB reorganized the regions and Kreisberg's jurisdiction expanded to cover both Connecticut and Massachusetts, now identified as new Region 1. Mystic insists that because the Board had no quorum in 2012, it could not validly appoint Kreisberg to his new post as the Regional Director of new Region 1 at that time.

The Board again argues that Mystic waived this argument because it was never made until the opening brief in this appeal. We disagree. Because this challenge and the argument that Regional Directors may not conduct elections while the Board lacks a quorum are both premised on the Board's lack of authority to act, we believe both are properly before us no matter when they were first raised. Nonetheless we reject Mystic's argument on the merits here as well. Mystic's nursing home is located in Mystic, Connecticut, inside the boundaries of old Region 34, which covered Connecticut alone. Mystic does not and could not contest that Kreisberg was validly appointed to administer old Region 34. There may be some question whether the Board had authority in 2012 to expand Kreisberg's jurisdiction to include Massachusetts, but that seems irrelevant to the question of whether he continued to have authority to conduct elections in Connecticut as he had since 2010. Surely adding Massachusetts to his jurisdiction or renaming the region he administered did not

impair his preexisting authority. Therefore we believe that his ability to conduct this election remains beyond dispute.[4]

B

Mystic argues that Diane Mackin's supervisory misconduct tainted the outcome of the election. We find that substantial evidence supports the Board's conclusion to the contrary.

1

Section 7 of the NLRA secures the rights of employees "to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining," as well as to refrain from all such activities. 29 U.S.C. § 157. To ensure that employees are fully able to exercise their section 7 rights, the Board requires that elections take place under "laboratory conditions" free from coercion by the union or the employer. *Harborside Healthcare, Inc.*, 343 N.L.R.B. 906, 909 (2004). Neither employers nor unions may "interfere with, restrain, or coerce employees in the exercise" of their section 7 rights. 29 U.S.C.

---

[4] Mystic made two other arguments attacking other potential bases for Kreisberg's authority: The Acting General Counsel, despite an authorization to manage the Board's internal administrative affairs while it lacked a quorum, did not have authority to appoint Kreisberg as Regional Director over new Region 1 in 2012; and a *nunc pro tunc* order the Board issued in 2014 to approve retroactively the acts it took while it lacked a quorum could not legitimately ratify Kreisberg's control of new Region 1. The Board has clarified that it does not rely on either of these rationales to justify Kreisberg's power to conduct this election and so we need not consider Mystic's arguments against them.

§ 158(a)(1), (b)(1)(A). Supervisors, defined as individuals with authority to direct, reward, or punish employees, *id.* § 152(11), do not hold section 7 rights. To the contrary, supervisors may not participate in or try to influence the outcome of an election any more than an employer itself is permitted to do so: "Election campaign statements by supervisors which reasonably cause [pro-union] employees to fear reprisal or to expect reward if they exercise their section 7 rights will ordinarily be attributed to the employer and found objectionable." *Harborside*, 343 N.L.R.B. at 906.

Of course, as a general matter, supervisors may be more likely to urge employees to oppose union organization than to support it because their interests are more aligned with those of the employer than those of the employees who seek to organize. However, pro-union supervisory conduct is just as impermissible because it poses the same risk of interfering with the free choice of employees. *Harborside*, 343 N.L.R.B. at 906. In other words, the law always forbids a supervisor from trying to influence the free choice of employees in exercising their section 7 rights, regardless of what outcome the supervisor is seeking to achieve. "This is true whether or not the statements or actions of the supervisor are consistent with the views of the employer." *Id.* at 907. After all, the average "employee is more concerned about the attitude of his immediate supervisor[s] than he is with the feelings of the company president," as his immediate supervisors "control his day to day life." *Id.* at 907 n.3 (quoting *Turner's Express, Inc. v. NLRB*, 456 F.2d 289, 292-93 (4th Cir. 1972)).

In *Harborside*, the Board established a two-step inquiry to determine "whether supervisory [pro-union] conduct upsets the requisite laboratory conditions for a fair election" such that the election result is invalid. 343 N.L.R.B. at 909. At the first step, the Board asks "[w]hether the

supervisor's . . . conduct reasonably tended to coerce or interfere with the employees' exercise of free choice in the election." *Id*. If so, the Board moves to the second step and asks "[w]hether the conduct interfered with freedom of choice to the extent that it materially affected the outcome of the election." *Id*. The effect of an individual episode of supervisory misconduct depends on "factors such as (a) the margin of victory in the election; (b) whether the conduct at issue was widespread or isolated; (c) the timing of the conduct; (d) the extent to which the conduct became known; and (e) the lingering effect of the conduct." *Id*. In other words, even conduct that actually interferes with employee choice will not invalidate the election result unless it actually influenced the outcome. But if a supervisor's pressure on employees played a meaningful role in the union's victory or the union's defeat, the Board will throw out the result and order a new election.

The Board measures the effect of a supervisor's impermissible conduct by also taking into account any "mitigating circumstances" that may have "sufficiently negated" the coercive activities such that the election result was not materially affected. *Veritas Health Servs., Inc. v. NLRB*, 671 F.3d 1267, 1272 (D.C. Cir. 2012) (quoting *SNE Enters., Inc.*, 348 N.L.R.B. 1041, 1042 (2006)). For example, the employer can mitigate a supervisor's conduct if it "'takes timely and effective steps to disavow' the conduct." *SNE Enters.*, 348 N.L.R.B. at 1043 (quoting *Harborside*, 343 N.L.R.B. at 914). That is, if the employer publicly announces that a supervisor lobbying on the union's behalf is acting against the employer's wishes, the employer limits the risk that employees will feel coerced. Employees will understand that the supervisor is simply a rogue agent and does not have the employer's support.

Separately, the Board also determines whether any anti-union effort by the employer itself had the effect of counteracting a supervisor's pro-union conduct. *Harborside*, 343 N.L.R.B. at 914. Of course, the NLRA forbids employer anti-union campaigns just as surely as it forbids pro-union lobbying by supervisors. However, the Board's inquiry focuses on the validity of the election as a whole, not simply on whether inappropriate conduct took place during the election period. An employer's effort to defeat a union does not violate the law if the union wins. More to the point, if the employer works at cross-purposes to a supervisor's pro-union activity during an election, the employer may end up neutralizing the supervisor's wrongdoing and inadvertently preserve the conditions necessary to reach a valid election result.

The record is clear and both parties acknowledge that Mackin's pro-union conduct satisfies the first step of the *Harborside* analysis. Nonetheless, at the second step of *Harborside*, the Board reasonably determined that Mackin's efforts did not materially affect the election's outcome because Mystic adequately made up for them by disavowing Mackin's conduct and by running its own anti-union campaign.

Substantial evidence supported this determination. Mystic required employees to attend anti-union meetings, sent materials to their homes, posted materials in the workplace, and even distributed anti-union bracelets for employees to wear at work as a way of showing their opposition to the Union. Mystic's campaign was much like another employer's efforts to defeat a union that the Board found neutralized pro-union conduct by supervisors. In *Terry Machine Co.*, 356 N.L.R.B. No. 120 (2011), supervisors who oversaw the bargaining unit were "actively involved" in a union

organizing drive. *Id.* at *2. At the same time, the employer "engaged in an extensive [anti-union] campaign," including mandatory company-wide meetings, individual meetings with employees, anti-union videos, anti-union postings, home mailings, and distribution of anti-union buttons to wear at work. *Id.* at *3. The Board upheld the election result despite the supervisors' substantial pro-union conduct, concluding that the employer's own anti-union campaign had adequately offset the supervisors' efforts. *Id.* at *5. The Board here reasonably concluded, just as it did in *Terry Machine*, that the combination of tactics Mystic deployed in its extensive effort to defeat the Union cancelled out Mackin's own attempt to help the Union prevail.

Mystic argues otherwise by attempting to minimize the significance of each element of its own anti-union program. It insists that few employees saw the anti-union materials, attended the anti-union meetings, or understood the intent behind the anti-union bracelets. None of these challenges to the Board's determination succeed. A number of employees testified that they received Mystic's anti-union materials through the mail or saw them posted in the workplace, and one even testified that she knew of other employees who had discussed the materials during the election. Although some employees testified that the anti-union meetings were sparsely attended, there was also testimony that "a lot" of the staff attended a meeting at one point or another. And while one employee testified that she did not recognize Mystic's anti-union bracelet, a number of other employees testified that they knew what the bracelets were for, wore bracelets themselves, and saw others wearing them. We cannot say that "no reasonable factfinder" could decide, as the Board did here, that Mystic's campaign was effective at neutralizing Mackin's pro-union advocacy. *Kiewit Power Constructors Co. v. NLRB*, 652 F.3d 22, 25 (D.C. Cir. 2011) (quoting

*United Steelworkers of Am., AFL-CIO-CLC, Local Union 14534 v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993)).

Substantial evidence also supported the conclusion that Mystic limited the effect of Mackin's conduct when it posted a public notice that disavowed her pro-union behavior, discussed the notice at mandatory employee meetings, and ultimately fired her. *See, e.g.*, *Terry Machine*, 356 N.L.R.B. No. 120, at *3 (finding that an employer's "explicit disavowals" and "widely disseminated termination threat . . . relieved any potential continuing pressure employees might have felt" from pro-union supervisory conduct). Mystic argues otherwise by suggesting that few employees ever saw the notice, that most employees did not attend the mandatory meetings and so would never have heard it discussed, and that any employees who were aware that the notice existed would not have realized it referred to Mackin because it did not identify her by name. We think the Board could reasonably reach the opposite conclusion on each count. Five employees testified that they saw the notice, and we have already noted that there was testimony indicating that "a lot" of employees attended the mandatory anti-union meetings at which the notice was discussed. One employee who saw the notice indicated that she knew the notice applied to Mackin in particular. Another testified that she understood the notice to refer to all supervisors who may have been inappropriately discussing the election—obviously including Mackin. Most significantly, Mackin told a number of employees around the time the notice was posted that Mystic had reprimanded her for advocating on behalf of the Union. In one case, she told an employee that the notice addressed her own behavior in particular. The Board could reasonably rely on all this evidence to conclude that employees knew of the notice and understood that Mystic was disavowing Mackin's conduct.

16

Even if employees somehow missed the existence or significance of the notice, they could not have misunderstood that Mystic was disavowing Mackin's pro-union behavior when it took the much more dramatic step of firing her. Though some employees testified that they did not know why Mackin was terminated, the Hearing Officer specifically found, and the Board subsequently agreed, that this testimony was not credible. *See SSC Mystic*, 2013 WL 6252453, at *1 n.2. Mystic has not challenged that credibility determination on appeal. Thus the only credible testimony before us comes from employees who said that they knew Mackin had been fired because of her pro-Union efforts. Joint Appendix 152. The Board was entitled to rely on this undisputed testimony to reach the commonsense conclusion that employees knew Mystic was conclusively disavowing Mackin's conduct by firing her. *See SNE Enters.*, 348 N.L.R.B. at 1043 (noting that an election result can be valid despite inappropriate pro-union supervisory conduct where an employer "'takes timely and effective steps to disavow' the conduct" (quoting *Harborside*, 343 N.L.R.B. at 913)).

We also agree with the Board that Mackin's firing limited the effect of her conduct despite the fact that she assured employees that the Union would help her get her job back. Mystic insists to the contrary that these assurances "blunted the impact" of Mackin's discharge by leading employees to believe that she would return to the workplace and regain the power to retaliate against the Union's opponents. But the opposite seems to be true. The record shows that several different employees who were subject to Mackin's pro-union pressure ended up opposing the Union by the time of the election, two weeks after Mackin was fired. Whatever the immediate effect of Mackin's campaign, employees who were among its targets were unafraid to oppose the Union after her discharge. And Mystic produced no evidence indicating that

employees she pressured to support the Union actually did so. The Board was entitled to conclude from this that Mackin's firing had broken whatever hold she might have exercised over employees.

In short, substantial evidence supports the Board's conclusion that Mystic's efforts to limit Mackin's effectiveness and its own anti-union campaign cancelled out Mackin's efforts on the Union's behalf and preserved the environment necessary for a valid representation election.

The Hearing Officer also noted that a number of other factors diminished the likelihood that Mackin influenced the election result. For example, Mackin was the sole pro-union organizer, naturally limiting the total amount of pressure that could be brought to bear on the Union's side of the ledger. And the election was not a close one. The Union won by sixty-four votes to forty, or almost one quarter of the entire voting population, indicating that any influence Mackin might have wielded over a few employees could not possibly have altered the result. Nor did Mackin's conduct "linger[]," *Harborside*, 343 N.L.R.B. at 909, as any influence she might have wielded at one time apparently dissipated before the end of the election period. The Board was entitled to rely on all these factors as part of its conclusion that Mackin's campaign did not materially alter the election outcome.

The Board was also entitled to conclude that the length of the time between Mackin's discharge and the election further limited the impact Mackin's efforts could have had on the outcome. Mystic insists that this decision was forbidden in light of Board decisions in which, it argues, the Board invalidated an election despite even longer intervals between the end of inappropriate supervisory conduct and an election. But in each of the cases Mackin cites, supervisors either

continued to lobby for the union throughout the election period, or the interval was immaterial because other factors helped the supervisors' influence linger. For example, in several of the cases, supervisors continued to campaign for the union "right up until the . . . election" took place. *Madison Square Garden CT, LLC*, 350 N.L.R.B. 117, 122 (2007); *see also Millard Refrigerated Servs., Inc.*, 345 N.L.R.B. 1143, 1144 (2005); *Harborside*, 343 N.L.R.B. at 913-14. And in the others, though the supervisors stopped campaigning before the election, the employer never publicly disavowed the supervisors' conduct and the supervisors remained in the workplace, allowing their pro-union pressure to linger. *See SNE Enters.*, 348 N.L.R.B. at 1044; *Chinese Daily News*, 344 N.L.R.B. 1071, 1072 (2005). This case is quite different. Mystic forcefully disavowed Mackin's conduct and fired her, dispelling the influence she might otherwise have exercised. No case forbids the Board's conclusion on this score. Absent such precedent, we cannot say the Board was wrong to decide that the effects of Mackin's conduct had at least in part evaporated by the time the election took place, especially when considered in conjunction with the other factors we have already discussed that limited Mackin's possible influence on the election.

Mystic points to *Veritas Health Services*, arguing that much more is required to neutralize the impact of a supervisor's pro-union activity than was present here. In *Veritas*, supervisors who pressured employees on behalf of the union ultimately switched sides and became fervent anti-union advocates, speaking directly to employees in the workplace and sending letters to most of the staff explaining that they no longer supported unionization. *Veritas*, 671 F.3d at 1273. This about-face, the Board found, neutralized the supervisors' previous pro-union conduct. *Id.* Mystic relies on *Veritas* to argue that Mackin's pro-union conduct was not

mitigated here because Mackin herself never disavowed her past support for the Union. But *Veritas* does not suggest that the only permissible form of mitigation is personal disavowal by the supervisor. And the Board has elsewhere found that an employer's own anti-union campaign can cancel out supervisory conduct like Mackin's. *See, e.g.*, *Terry Machine*, 356 N.L.R.B. No. 120, at *3, *5. The Board was entitled to do the same here.

Finally, Mystic insists that the Board unfairly showed more lenience toward Mackin's pro-union conduct than it would have shown had Mackin successfully urged employees to vote against the Union instead. *See Harborside*, 343 N.L.R.B. at 906-07 (holding that both pro- and anti-union coercion are equally impermissible). We need not engage with the hypothetical circumstance Mystic would have us imagine. Mystic has offered no support for its assertion that the Board displayed bias. The Board ruled that Mystic's anti-union campaign made up for Mackin's impermissible pro-union conduct, just as it has found in the past. There is no basis to criticize the Board's conclusion regarding what actually transpired here.

Mackin's campaign to help the Union succeed was inappropriate. However, a number of factors showed its limited effectiveness: Mackin acted alone; she was dismissed from the workplace well before the election took place; her conduct apparently had little lingering effect; and the Union prevailed by a substantial margin. By disavowing Mackin's pro-union advocacy and ultimately firing her, Mystic further minimized her impact on the result of the election. And Mystic's own efforts to defeat the union provided a powerful counterbalance to Mackin's lobbying. Based on this record, the Board was entitled to conclude that the election result challenged here was valid.

C

Finally, Mystic argues that the Hearing Officer erred by refusing to enforce Mystic's subpoena of Mackin's telephone records, which the company claims would show that Mackin was acting as the Union's agent. Refusing to enforce this subpoena did not prejudice Mystic. *See Ryerson*, 216 F.3d at 1154 (noting that we will only reverse the Board's decision not to enforce a subpoena "if prejudicial"). Even proving that Mackin was a Union agent would not have altered the Board's determination that the election was valid. It is true that coercively interrogating an employee is yet another way in which employers and unions can violate the section 7 rights of employees. *See Millard Refrigerated Servs.*, 345 N.L.R.B. at 1146. But we have already found that substantial evidence supports the Board's determination that all of Mackin's inappropriate conduct was adequately offset by Mystic's own conduct with respect to Mackin in particular and the overall election in general. The Board's ultimate conclusion as to the propriety of the election remains valid regardless of whether Mackin was acting as an agent of the Union.

Mystic insists otherwise and points to our recent decision in *Ozark Automotive Distributors, Inc. v. NLRB*, 779 F.3d 576 (D.C. Cir. 2015). There, an NLRB hearing officer had refused an employer's effort to subpoena documents it believed might show that employees who had advocated on behalf of the union during a representation election were union agents who had played a large role in influencing the election. We found that refusing to enforce the subpoena in that case was prejudicial because obtaining the records would have given the employer critical advantages that it otherwise lacked in putting on its case. But those considerations are not present here. The records would not have revealed any information

other than the existence of conversations between Mackin and the Union organizer, two individuals already well known to Mystic. The records could not have served as new evidence or helped to identify new leads or witnesses. And because Mystic failed to call either Mackin or the Union organizer to testify, the records could not have helped impeach or examine them. *Id.* at 585. Admittedly, the Hearing Officer directed the Union to produce the organizer and the Union failed to do so. But Mystic also failed to remind the Hearing Officer of her instruction or to mention the organizer or the subpoena again in any way. Mystic cannot complain that it was prejudiced when it failed to call the only witness whose testimony might have made the records relevant.

Mystic also argues that the Board's decision in this case is undermined by its decision in *Voith Industrial Services, Inc.*, No. 09-CA-075496, 2012 WL 4169024 (Sept. 19, 2012). In *Voith*, the Board found an abuse of discretion where a Hearing Officer refused to enforce a subpoena for records regarding the relationship between an employer and the union that represented its employees because the records were at least "potentially relevant." *Id.* at *1. But here, regardless of whether the records were relevant to the question of Mackin's status as a Union agent, they could not have altered the Board's decision that Mackin's lobbying did not contaminate the election result because it was offset by Mystic's public discipline of Mackin and Mystic's own anti-union conduct. Mystic was not prejudiced because these records simply could not have changed the outcome. And absent any prejudice we have no basis to reverse the Board with respect to the subpoena. *Ryerson*, 216 F.3d at 1154.

III

For the foregoing reasons, we deny Mystic's petition for review and grant the NLRB's cross-application for enforcement of its order.

SRINIVASAN, *Circuit Judge*, *concurring*: I join the court's opinion, including its rejection of Mystic's argument that the Regional Director had no authority to conduct the representation election given the absence of a Board quorum. In rejecting that argument, our opinion relies on the explanation set forth in *UC Health v. NLRB*, __ F.3d __ (D.C. Cir. 2015), which rejected the same argument in an opinion issued contemporaneously with ours in this case. I fully agree with the conclusion of *UC Health* as described in our opinion here: that we "must defer to the Board's reasonable interpretation that the lack of a quorum at the Board does not prevent Regional Directors from continuing to exercise delegated authority." *Ante* at 8.

I write separately to note that, with regard to one aspect of the explanation in *UC Health* for rejecting the Board-quorum argument, I see things a bit differently. In both cases, the employer argues that our prior decision in *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469 (D.C. Cir. 2009), precludes the Board from adopting the interpretation of the quorum statute we now review. I agree with the *UC Health* majority that *Laurel Baye* poses no bar to the Board's reaching that interpretation. My reasons for reaching that conclusion, though, vary in some measure from those of the *UC Health* majority.

I would rely on the approach set out in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005). In *Brand X*, the Supreme Court established a rule for determining when a prior judicial interpretation of a statute forecloses an agency from adopting a contrary reading. The rule set forth in *Brand X* governs an agency's freedom to depart from a prior judicial interpretation regardless of whether that interpretation was set out in a "pre-*Chevron* judicial decision," *UC Health*, slip op. at 7-8 (Silberman, J., dissenting), or instead in a post-*Chevron* judicial decision, as was the case in *Brand X* itself. *See* 545 U.S. at 979-80. In

either situation, *Brand X* establishes that an agency remains free to construe a statute it administers in a manner at odds with the prior judicial interpretation *unless* the court's decision purported to define the "*only permissible* reading" of the statute, *id.* at 984—"the same demanding *Chevron* step one standard that applies if the court is reviewing the agency's construction on a blank slate," *id.* at 982. If the court instead articulated only the "*best* reading" of the statute, the agency retains discretion to implement a contrary interpretation. *Id.* I believe *Laurel Baye* is best read to have done the latter.

As a result, while the *UC Health* majority and dissent disagree over whether *Laurel Baye*'s statutory holding governs delegations of the Board's authority to Regional Directors (as the dissent contends) or instead pertains only to delegations to Board sub-groups (as the majority holds), *see* 29 U.S.C. §153(b), I view that question to be beside the point. *Laurel Baye*'s holding, regardless of whether it reaches delegations to Regional Directors, does not purport to adopt the *only permissible* reading (as opposed to merely the *best* reading) of the statute. *Brand X* therefore left the Board room to adopt a contrary reading, which the Board has now done.

Of course, there would be no dispute about how best to understand *Laurel Baye* if our court had occasion in that case expressly to apply *Chevron*'s two-step framework. Had we had occasion to do so, and had we resolved the interpretive question at *Chevron* step one, we would have confirmed that our interpretation was the "only permissible" one. *See Brand X*, 545 U.S. at 982-83. But *Laurel Baye* contains no mention of *Chevron*, much less any express application of its two-step test. That is presumably because the Board did not seek *Chevron* deference in *Laurel Baye*. And insofar as the applicability of *Chevron* presents no issue of jurisdiction, *see Lubow v. Dep't of State*, 783 F.3d 877, 884 (D.C. Cir. 2015),

we had no obligation to walk through the *Chevron* framework in our opinion in the absence of a request by the Board to do so. I assume the *Laurel Baye* court made no express reference to *Chevron* for that reason.

In saying so, I am in no way "essentially accus[ing] the *Laurel Baye* panel of disregarding governing law applying to judicial review of agency statutory interpretations," *i.e.*, *Chevron* deference. *UC Health*, slip. op. at 7 (Silberman, J., dissenting). The point here is not that the *Laurel Baye* court shirked any requirement to apply the *Chevron* framework. The point instead is that, because the Board did not claim any entitlement to *Chevron* deference, the *Laurel Baye* court presumably felt it had no obligation expressly to march through *Chevron*'s two steps in its opinion. Regardless of whether, by failing to argue any entitlement to it, an agency can forfeit a claim to *Chevron* deference, it is fully understandable why the *Laurel Baye* opinion makes no effort expressly to apply *Chevron*'s two-step test. Why walk through *Chevron*'s two-step deference framework in the opinion if the Board made no claim of entitlement to *Chevron* deference in the first place?

This is all a fairly roundabout way of making what I see as the ultimate point for purposes of determining whether the Board retained freedom under *Brand X* to disagree with the *Laurel Baye* court's interpretation: because *Laurel Baye* did not explicitly invoke the *Chevron* framework (understandably, given that the court was not asked to), we simply do not know from the *Laurel Baye* decision whether its rejection of the Board's interpretation fell at *Chevron* step one. Judge Silberman, in his dissent in *UC Health*, posits that, even though *Laurel Baye* does not say a word about *Chevron*, its rejection of the Board's interpretation *must* have been at *Chevron* step one. He suggests that, in the era of

*Chevron*, a reviewing court can *never* adopt merely a "best reading" of a statute when—as in *Laurel Baye*—the court is faced with a contrary agency interpretation. *Id.* at 7-9.

I disagree. For instance, what if an agency's interpretation is ineligible for *Chevron* treatment because it was issued without the requisite procedures? *See United States v. Mead Corp.*, 533 U.S. 218, 231-32 (2001). In that event, a reviewing court surely can reject the agency's interpretation in favor of the court's "best reading" without necessarily having to decide whether the "best reading" is also the "only permissible" one (or without remanding to the agency). *See Christensen v. Harris Cty.*, 529 U.S. 576, 586-87 (2000); *Miller v. Clinton*, 687 F.3d 1332, 1342, 1352 (D.C. Cir. 2012). As we have said in such a situation, "[w]ith *Chevron* inapplicable," we "must decide for ourselves the best reading." *Miller*, 687 F.3d at 1342 (internal quotation marks omitted); *see id.* at 1352. If the court then were to reach a "best reading" contrary to the agency's interpretation, the agency, as *Brand X* makes clear, could later disagree and issue a new interpretation (which, if adopted pursuant to the requisite procedures, would be entitled to *Chevron* deference). *See* Richard J. Pierce, Jr., 1 Administrative Law Treatise §3.5, at 182 (5th ed. 2010). In short, there certainly *can* be situations in which a reviewing court rejects an agency's interpretation in favor of the "best reading" (rather than in favor of the "only permissible reading"), in which case the agency would retain leeway under *Brand X* to disagree.

So where does that leave us here? The question is whether, notwithstanding the *Laurel Baye* court's understandable decision to refrain from expressly invoking *Chevron*'s two-step framework, we somehow know that the court in fact rejected the Board's interpretation as a step one "only permissible reading" resolution. We do not. Even

assuming, *arguendo*, that the *Laurel Baye* court was required to entertain *Chevron* at all despite the Board's failure to claim any entitlement to *Chevron* deference (and assuming that the *Laurel Baye* court believed it was required to do so), we do not know why the court declined to give effect to the agency's interpretation.

As Judge Silberman suggests, it *might* have been based on a conclusion that the Board, rather than arriving at an interpretation as a matter of discretion, simply believed its reading to be compelled by the statute (in which case, for the reasons he argues, the absence of a remand would tend to indicate a step one resolution). *UC Health,* slip op. at 6, 8 (Silberman, J., dissenting). But perhaps the court instead believed that the Board, as the petitioning company argued, lacked *Chevron* authority to construe this particular statute in the first place because it "presents a question of power or jurisdiction[.]" Brief for Petitioner at 10, *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469 (D.C. Cir. Nos. 08-1162(L), 08-1214). That argument could have had more purchase before the Supreme Court's decision in *City of Arlington v. FCC*, 133 S. Ct. 1863 (2013), when this court had held that "the existence of ambiguity is not enough per se to warrant deference to the agency's interpretation" because the agency may lack delegated authority "to make a deference-worthy interpretation of the statute" at issue. *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 468-69 (D.C. Cir. 2005); *see Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002); *see also* Nathan Alexander & Jonathan H. Adler, *The Rest Is Silence: Chevron Deference, Agency Jurisdiction, and Statutory Silences*, 2009 U. Ill. L. Rev. 1497, 1499-1500 (2009) (describing *Am. Bar Ass'n* as a decision about "agency jurisdictional determinations"). After all, the Board in its brief raised no objection to that argument by the company. If the *Laurel Baye* court thought *Chevron*

might be inapplicable for that reason, the court would have been free to reject the agency's interpretation based on a "best reading." The bottom line is that we cannot be certain from the *Laurel Baye* opinion that the court issued the equivalent of a *Chevron* step one "only permissible reading."

While the *Laurel Baye* court understandably did not expressly work through *Chevron*'s two-step framework given the absence of any request by the Board to do so, there is another way in which the *Laurel Baye* court could have removed any doubt about whether it considered its rejection of the Board's interpretation to rest on the "*only permissible* reading" of the statute. *Brand X*, 545 U.S. at 984. The court could have said so. *Laurel Baye* came after *Brand X*. And post-*Brand X*, we issue decisions in awareness of the interpretive backdrop against which our opinions construe statutes administered by an agency. Following *Brand X*'s roadmap, a court could preclude an agency's adoption of a contrary interpretation by saying expressly that the court's holding rests on the "*only permissible* reading" of the statute, *id.*, or by explicitly "hold[ing] that the statute unambiguously requires the court's construction," *id.* at 985. In the absence of any definitive formulation of that variety, we are in the position of having to parse a prior opinion's language to divine whether it expressed with adequate clarity the equivalent of a *Chevron* step one holding—*i.e.*, an "only permissible reading" resolution.

I do not read *Laurel Baye* to have done so. The opinion stops short of concluding that the statutory terms accommodate only one permissible interpretation concerning whether a Board delegee can continue to act if the Board ceases to maintain a three-member quorum. To be sure, the opinion necessarily holds that such a reading at least presents the *best* interpretation of the statute. But we did not go

further to—and we had no necessary occasion to—decide that the best reading also was the only permissible one. To the contrary, we said that "the case before us presents a *close question*," and that the Board's interpretation was not "entirely indefensible" (which is essentially to say, it was "defensible"). *Laurel Baye*, 564 F.3d at 476 (emphasis added). Those words suggest something considerably less than a definitive, *Chevron* step one interpretation.

Of course, we also did not go so far as to say that a contrary reading necessarily would be reasonable. One can certainly locate language in the opinion that might have been used in service of an "only permissible reading" resolution. *E.g., id.* at 473 (noting that, because "[t]he statute confers no authority on" the delegee and "[t]he only authority by which the [delegee] can act is that of the Board," if "the Board has no authority, it follows that the [delegee] has none"). But when read in the context of an opinion that considered the question to be "close" and a contrary reading to be somewhere in the neighborhood of a "defensible" one, the cited language is no less consistent with a "best reading" holding than with an "only permissible reading" holding. And while *Laurel Baye* at times invokes terms such as "unequivocal[]" and "clearly" in discussing the statute, it does so only in making the predicate point that—as the plain terms of the statute themselves specify—the Board must "at all times" satisfy a three-member quorum requirement. *Id.* (quoting 29 U.S.C. § 153(b)). In my reading, we did not use those sorts of definitive terms in resolving the subsequent question ultimately at issue: whether a delegee appointed by a properly constituted Board can itself continue to act in the event the Board later slips below three members. As to the latter question, I understand our opinion to have reached a "best reading," not an "only permissible reading."

The cited language and other such passages, at most, would render it fairly debatable whether *Laurel Baye* intended to adopt the equivalent of a *Chevron* step one holding. I would not strain to find a step one resolution in an opinion amenable to a contrary understanding. If anything, I would err on the side of construing a decision to have reached a "best reading" (rather than an "only permissible reading") resolution.

Mistakenly understanding a prior decision to have adopted a step one interpretation would have significant consequences. In that event, we would erroneously freeze in place our "best reading" of a statute even though Congress, according to the basic assumptions underlying *Chevron*, would have intended to delegate to an agency primary authority to construe the statute as it sees fit within the scope of its delegation. The result would be one *Brand X* specifically sought to avoid: "'ossification of large portions of our statutory law,' by precluding agencies from revising unwise judicial constructions of ambiguous statutes." 545 U.S. at 983 (quoting *Mead*, 533 U.S. at 247 (Scalia, J., dissenting)).

Now suppose, conversely, that we instead err in favor of perceiving a "best reading" resolution in a prior opinion that in fact intended to go further and establish the "only permissible reading" of a statute (and thus to preclude an agency from adopting a contrary interpretation). In that event, the error would have become salient only because the agency later elected to implement a reading of the statute contrary to our prior interpretation. And the error would be short-lived: Our court (or the Supreme Court), in the process of judicial review, would have the final word on whether the agency's reading could be squared with the statute. Our

review of the Board's interpretation in this case (and in *UC Health*) perfectly illustrates the point.

For those reasons, I read *Laurel Baye* to have decided the best reading of the Board quorum statute, not the only permissible reading, leaving the Board free under *Brand X* to adopt a contrary interpretation. The Board has done so, and here (and in *UC Health*)—unlike in *Laurel Baye*—seeks *Chevron* deference for its interpretation. For the reasons explained by the *UC Health* majority, I believe the Board is entitled to that deference.

SENTELLE, *Senior Circuit Judge*, dissenting: Relying on *UC Health v. NLRB*, __ F.3d __ (D.C. Cir. 2015), the majority concludes that a regional director has the authority to conduct an election even if the Board lacks a quorum. I disagree and would instead set aside the election because the regional director's authority to act "ceased the moment the Board's membership dropped below its quorum requirement of three members." *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469, 473 (D.C. Cir. 2009).

Section 153(b) contains four provisions: (1) the delegation clause; (2) the vacancy clause; (3) the Board quorum requirement; and (4) the group quorum provision. *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 680 (2010) (summarizing 29 U.S.C. § 153(b)). In *Laurel Baye*, we held that the third provision, the quorum requirement, "clearly requires that a quorum of the Board is, 'at all times,' three members." 564 F.3d at 473. The phrase "at all times," we explained, is "unambiguous" and "denotes that there is no instance in which this Board quorum requirement may be disregarded." *Id.*; *see also id.* ("Congress provided unequivocally that a quorum of the Board is three members, and that this requirement must be met at all times."). Simply put, we held that "the Board cannot by delegating its authority circumvent the statutory Board quorum requirement, because this requirement must always be satisfied." *Id.*

The majority in *UC Health* purports to create an exception for regional directors. I reject *UC Health*'s analysis for the same reason the Supreme Court rejected the Board's rationale in *New Process Steel*: it "dramatically undercuts the significance of the Board quorum requirement by allowing its permanent circumvention." 560 U.S. at 681. Even though *New Process Steel* did not rely on our discussion of agency, *see id.* at 684 n.4 ("our decision does not address" that "separate question"), neither did the Supreme Court overrule

our decision in *Laurel Baye*. We remain bound by it as circuit law.

I see little point in rehashing the debate between Judge Silberman in the companion case and Judge Srinivasan in this one over the absence of a *Chevron* discussion in *Laurel Baye*. I do think it worth at least passing mention that in the Supreme Court decision which ultimately construed the same statute as *Laurel Baye*, *New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010), neither the majority nor the dissent makes any reference to *Chevron*. Neither, apparently, did the government, since all references to the government argument in *New Process Steel* deal with interpretation of the statute *per se*, rather than an analysis of the NLRB's administrative conduct. For example, at 680, the Court states, "One interpretation, put forward by the Government, would read the clause to require only that a delegee group contain three members at the precise time the Board delegates its powers .…" In analyzing the government's position, the Court stated, "Hence, while the Government's reading of the delegation clause is textually permissible in a narrow sense, it is structurally implausible, as it would render two of § 3(b)'s provisions functionally void." *Id.* at 681. For what it's worth, the Seventh Circuit in the decision reviewed by the Supreme Court in *New Process Steel* also made no reference to *Chevron*. *See New Process Steel, L.P. v. NLRB*, 564 F.3d 840 (7th Cir. 2009). That said, the fact that the *Laurel Baye* court did not discuss a government position that the government did not raise seems to me to be of little consequence.

Because *Laurel Baye* concluded that § 153(b)'s quorum requirement provision unambiguously requires the Board to have a quorum for a delegee to exercise its authority, *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005), does not apply. And, for the

reasons discussed by Judge Silberman, we may not apply *Chevron* deference to the Board's interpretation of § 153(b). *See UC Health*, Slip op. at 5–6 (Silberman, J., dissenting). Even if *Chevron* deference applied, the Board's interpretation of § 153(b) is unreasonable under step two. *See id.* at 5.

I respectfully dissent.